Argued and submitted December 9, 2003, parenting schedule modified; remanded for modification of child support; otherwise affirmed November 10, respondent's petition for reconsideration filed November 23, and appellant's response to petition for reconsideration filed December 1, 2004, allowed by opinion February 2, 2005
See 197 Or App 391, 105 P3d 944 (2005)

## In the Matter of the Marriage of

Karen Lynese SHELTON,
nka Karen Lynese Melius,
*Respondent,*

*and*

Danny Jay SHELTON,
*Appellant.*

C932441DR; A119483

100 P3d 1101

Kristin Winnie Eaton argued the cause for appellant. With her on the briefs was Gevurtz, Menashe, Larson & Howe, P. C.

Margaret H. Leek Leiberan argued the cause for respondent.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Deits, Judge pro tempore.

DEITS, J. pro tempore.

---

* Brewer, C. J., *vice* Leeson, J. pro tempore.

**DEITS, J. pro tempore**

Father appeals a modification of a dissolution judgment, primarily challenging a reduction in his parenting time. On *de novo* review, ORS 19.415(3) (2001),[1] we modify the parenting schedule, remand the case for recalculation of child support, and otherwise affirm.

Mother and father have two children, L and A, who were 14 and 11 years old, respectively, at the time of the modification hearing in 2002. When the parties' marriage was dissolved in 1993, they agreed to joint custody. The children's primary residence was with mother, and father was given substantial parenting time, including every Thursday at 5:00 p.m. until either Saturday evening or Sunday morning,[2] alternate major holidays, Christmas Eve, Father's Day, and two weeks during the children's summer vacation. That schedule continued virtually uninterrupted for eight years.

At the time of the dissolution, mother and father resided less than five miles apart. Some time after the dissolution, mother moved to a location about 16 miles away from father's residence. In 2000, mother again moved, this time to a residence in Clackamas about 24 miles from father's residence. Both mother and father have remarried.[3] Father's

---

[1] The legislature amended ORS 19.415(3) in 2003. Or Laws 2003, ch 576, § 88 ("Upon an appeal from a [*decree*] **judgment** in a **case that constituted a** suit in equity **under common law**, the Court of Appeals shall try the cause anew upon the record." (Additions in boldface; deletions italicized in brackets.)). We need not decide whether the 2003 amendments to ORS 19.415(3) affect our standard of review because those amendments apply to the appeal of judgments that were entered on or after January 1, 2004. *See* Or Laws 2003, ch 576, § 90a ("The amendments to ORS * * * 19.415 * * * by sections 85 to 89 of this 2003 Act apply only to the appeal of judgments entered *on or after* the *effective date* of this 2003 Act. Any appeal of a judgment entered before the effective date of this 2003 Act shall continue to be governed by the law in effect on the day immediately preceding the effective date of this 2003 Act."). Based on the plain meaning of the text of Oregon Laws 2003, chapter 576, section 90a, we apply the 2001 version of ORS 19.415(3) in this case. *But see Kunze and Kunze*, 337 Or 122, 124, 92 P3d 100 (2004) (apparently citing the current version of ORS 19.415(3) in addressing a judgment that was entered before January 1, 2004).

[2] It appears that, in practice, father's parenting time usually ended on Sunday mornings.

[3] It appears that both remarriages occurred close to the time when these modification proceedings began. Father and his new wife, however, have been together since 1994.

wife has a college-age son from her previous marriage, and mother's husband has custody of his three sons from his previous marriage.

In August 2001, mother moved for modification of the dissolution judgment. She sought, among other things, termination of joint custody and modification of the parenting schedule. The parties stipulated that mother have custody. They also agreed that the parenting schedule needed to be changed. They did not agree, however, about *how* the parenting schedule should be modified.

The parties agreed to a parenting time evaluation by Dr. Brounstein, a clinical psychologist with experience in parenting evaluations. Brounstein conducted an extensive review, talking with all the children and parents involved. In his report, he first noted that both mother and father were "reasonably well adjusted adults" and that "both are readily able and willing to focus on the best interests of their children." He also noted that it was to the children's benefit that they participate in two "positive functional family units." However, he stated that

> "the relatively recent and temporally close remarriages of both parents to their spouses have shaken * * * a previously harmonious parenting time arrangement * * *. Simultaneous to these changes have come the changes in the developmental stages of the children, as well as those of the two developing family systems * * *. The children are requiring more autonomy (time with friends, increased authority over such things as schedule, music, grooming, recreational activities and bedtimes)."

In view of the "changing developmental needs of the children as well as the promotion of family cohesiveness" in both households, Brounstein recommended the following modification of father's parenting time: On alternate weeks, the children would be with father from Wednesday afternoon until Sunday at 5:00 p.m. or Monday morning.[4] During the other weeks, the children would be with father from Wednesday afternoon until the start of school on Thursday.

---

[4] At the hearing, Brounstein explained that, based on the parties' previous interactions, he thought it was appropriate to give them the flexibility to choose between a Sunday night and Monday morning end for father's parenting time.

Brounstein recommended retaining other provisions of the original parenting schedule, including the split holiday times and two weeks' uninterrupted parenting time for father in the summer. Father urged the court to adopt Brounstein's proposal. As explained below, mother agreed with some parts of Brounstein's recommendation but took issue with other parts.

At the modification hearing, Brounstein testified that both children were well adjusted and healthy emotionally and deeply attached to both parents, and that they had "special attachments to all of the adults in their family, to mother and stepfather and father and stepmother." He also explained that the children "are now at a developmental level far different from where they were when the * * * original parenting time plan was established" and, because of their ages, the children did not need the same frequency of parenting time that was required when they were young children. Brounstein testified that the children did not tell him that they desired a change in schedule or that they were bothered by the commute between households, stating, "I think in [a] sense mother initiated * * * this action to seek a change and I think as much being a voice in the children's best interest."

Brounstein's recommendations were based on his opinion that father should have a "large number of nights with the children" and that the parenting schedule should be consistent because the children had benefitted from the "consistency of rhythm" that existed under the original parenting schedule and from the great effort that father was making to do the driving necessary to spend time with them. However, Brounstein also indicated that it made sense for father to have blocks of parenting time when the children did not have to be transported and there was less conflict with their schedules:

"I recognize under the circumstances that to have these back and forth, back and forth things happen every single week with half of a weekend was just chopping things up too much for the children. It doesn't allow for the families to establish traditions. It doesn't allow them to settle in in their added relationships."

Brounstein agreed that the children should have a greater say in what they do and how they do things but indicated that there was no reason to reduce the amount of time that father would have with the children on a week-to-week basis. He also indicated that, with respect to mother's concern about the long commute to father's house, the benefit of father's interaction with the children during that time outweighed the negative aspects. Finally, Brounstein did not believe that the children had any need to spend time in one household over the other.

As noted, mother agreed with much of Brounstein's recommendation. However, according to mother, both children had come to her with complaints about the existing parenting schedule and had expressed a desire for a "home base." She testified that she wanted a more "traditional" parenting schedule that would be less intrusive to the children's homework and other activities, because "the kids [have] reached the age where they wanted to do more activities with friends, family, just events. And a lot of these things did come up [on] Thursdays, Fridays and Saturdays." For those reasons, mother testified that it was becoming unworkable for the children to be with father every weekend. Accordingly, mother agreed with Brounstein's recommendation of every-other-week extended parenting time for father. In her view, however, that time should begin on Friday night (Brounstein had recommended Wednesday afternoon) and run through Monday morning (Brounstein had recommended either Sunday at 5:00 p.m. or Monday at the start of school). Mother also disagreed with the recommendation of a midweek overnight on alternate weeks. Her primary reason was that the midweek commute from her home to father's home was causing stress for the children and disrupting their homework time. Mother agreed with Brounstein that father should continue to have two weeks of summer vacation. Further, she suggested that she would be agreeable to alternate spring, Thanksgiving, and Christmas vacations, something that the parties had not done in the past.

Father agreed that a change in the parenting schedule was appropriate. In particular, he acknowledged that it had become appropriate for each parent to have a "full weekend." Father's primary concerns were that his overall

amount of parenting time not be reduced and that he continue to have regular involvement with his children on a week-to-week basis. Father disagreed with mother's view of the effect of the frequent commutes on the children. He viewed the commute as a benefit because it gave him uninterrupted time with the children to discuss their homework and extracurricular activities. He further stated that the children enjoy their conversations during the drives. He stated that the children had not complained to him about the commute or the parenting schedule. Father testified that he believed it was important for both parents to continue to be involved with the children on a week-to-week basis in order to keep up-to-date and involved with their activities. In father's view, restricting weekly time with either parent would harm the children's relationship with that parent and undermine the benefits the children had received from having two active parents.

In response to a question from the trial court, father indicated that he currently had 12 nights per month with the children. The trial court questioned father whether it would be acceptable to maintain a similar number of "overnights"[5] per year—which it calculated to be 144—but allocate them differently—specifically "doing it as a huge block of time in the summer as opposed to Wednesdays and Thursdays." Father responded, first, that a long block in the summer would interfere with mother's parenting time. When the court explained that father's summer block could be subject to mother having alternate weekends, father stated:

> "Well, I think where I stated earlier where I want to be involved every week with the kids' lives and that's why the current schedule I really like. * * * [E]very week the kids are with [mother] and they're with me. And if we, you know, go to a time where I'm not involved on a weekly basis, I'm not going to be able to help the kids with schoolwork. Like [mother] said, [L] is really involved in basketball and I'm an integral part of helping her in basketball. So that would be

---

[5] This sense of "overnight" as a noun may not be recognized in all dictionaries. We use it in this opinion to refer to any night that the children sleep overnight in a parent's home to avoid any ambiguity that might arise from the term "overnight visit," which might be construed to refer to an inclusive block of days during which the children sleep overnight in a parent's home.

my concern. If we limit that weekly time, then I'm not a real influence, you know, on a weekly basis when they're in school."

In making its ruling, the trial court indicated that a modification from the original schedule was necessary due to the age of the children and changes in the parties' ability to cooperatively coparent after mother's remarriage and move to Clackamas. The trial court also indicated that, although it was generally reluctant to depart from the recommendation of the evaluator, it was doing so in this case because it found that the children were at least partially the instigators, through mother, for the change. The court indicated that its modification was a compromise between Brounstein's recommendation—which the court understood to provide father "a lot less" time than the original parenting schedule—and mother's proposal.

The trial court's primary modifications to the parenting schedule were as follows: Father was given parenting time every other Thursday afternoon through Sunday afternoon. The court reasoned that the children should spend Sunday night with mother because "all of us in America kind of hunker down and figure out what we're going to do and I think that would be better to have that at home base and do it at your home base." During the weeks in which father did not have the children from Thursday through Sunday, he was given parenting time from 5:00 p.m. until 9:00 p.m. on Wednesday. The children were to spend seven weeks of their summer vacation with father; two of the seven weeks were to be uninterrupted by mother's weekend parenting time. Major holidays were to be alternated. Each parent was to have one week with the children during Christmas vacation, and father would have the children during their spring vacation.

As noted, the parties agree that it is in the children's best interests to change the parenting schedule. Father and mother differ primarily about the amount of parenting time that father should have. Father contends that the significant decrease in parenting time in the modified parenting schedule is neither consistent with Brounstein's recommendation nor in the best interests of the children. According to father's

calculations, his parenting time before the modification judgment was approximately 164 overnights per year, or 44.9 percent of all overnights, and Brounstein's recommendation would have yielded a similar number of overnights. Father further calculates that his parenting time under the modified judgment is no more than 121 overnights per year, or 33.2 percent of all overnights. Father suggests that the trial court did not fully appreciate the extent to which its modification departed from Brounstein's recommendation. Father contends that this situation is similar to that in *Deffenbacher and Deffenbacher*, 168 Or App 331, 5 P3d 1190 (2000), a case in which we modified a parenting schedule in which the trial court had decreased the father's parenting time by almost half without explaining why it was departing from the evaluator's recommendation or why the reduction was in the best interests of the child.

Mother evaluates the modified parenting schedule using "waking hours" and calculates that father's "net loss" under the modified judgment is only 22 hours per year for L and 59 hours per year for A. Moreover, mother argues that a "more traditional" parenting schedule is more appropriate at this time, in light of the children's increased need for a "home base" due to involvement in activities such as sports and spending time with school friends. Mother contends that the modification here is not akin to that in *Deffenbacher*, noting that the trial court in this case gave several reasons why it concluded that the modification that it devised was in the best interests of the children.

■■ In determining parental visitation rights, our primary concern is the best interests of the children. *Stringham and Stringham*, 124 Or App 626, 630, 863 P2d 504 (1993); *Maddox and Maddox*, 56 Or App 345, 349, 641 P2d 665 (1982). We review *de novo*, but we give weight to the trial court's ability to observe witnesses firsthand and do not lightly disturb the trial court's assessment of the best interests of the children. *Deffenbacher*, 168 Or App at 335; *Dominguez and Dominguez*, 154 Or App 430, 434, 961 P2d 906 (1998).

As noted, the parties differ about how much the trial court's modified parenting schedule actually reduces father's

parenting time. Mother argues that, considering the number of waking hours that father is allowed to spend with the children, his parenting time was not significantly reduced. Father, on the other hand, argues that the number of overnights that he has the children has been substantially reduced. There is no perfect way to measure the amount of time that a parent has with his or her children under a parenting schedule. However, the number of overnights appears to be an appropriate and generally fair measure of parenting time in this case. We recognize that time spent by a parent with a child apart from overnights can, in some cases, be a valid component of a parenting schedule. In this case, however, it appears that the children have historically had close bonds with two family units and have identified themselves as members of both households; overnights serve to maintain those bonds and identification in a way that other types of parenting time would not.

Applying that measure, we conclude that father's parenting time has been significantly reduced. As noted, the trial court believed that father had approximately 144 overnights under the original parenting schedule. On *de novo* review, we find that the number of overnights under the original schedule was closer to 164. Father had three overnights per week for 50 weeks of the year, plus two weeks of uninterrupted parenting time in the summer. Although it appears that each parent gained or lost some overnights each year depending on holiday schedules, 164 overnights appears to be a fairly close estimate. Also, as noted, the trial court believed that Brounstein's recommendation offered father "a lot less" time with the children. We come to a different finding on that point as well. Under Brounstein's recommendation, father would have received four or five overnights per week for 25 weeks of the year, one overnight a week for 25 weeks, plus two weeks of uninterrupted parenting time in the summer, for a total of 139 if the children returned to mother's home on Sunday night or 164 if they returned on Monday. Again recognizing some gain or loss depending on the holiday schedule—which under Brounstein's recommendation would have remained the same as under the original schedule—we conclude that father would not have had a significant loss in parenting time under Brounstein's proposal.

As did the trial court, Brounstein, and both parents, we conclude that the best interests of the children indicate a change to an alternate weekend schedule. However, we also conclude, on *de novo* review of the record in this case, that there is no reason to reduce either the overall amount of father's parenting time or the pattern of his meaningful weekly involvement. Even if the children themselves partly instigated this change by expressing their concern to mother, we are not persuaded that that indication of their best interests outweighs other indications of their best interests. The children have strong emotional ties with both families, mother and father want the children to maintain those ties, and both mother and father have proved themselves to be exemplary parents. As Brounstein observed, father has maintained substantial involvement with the children, and it is in the best interests of the children for father to continue that involvement in their lives. There is no indication that father will not work to facilitate the children's needs and adjust to their needs as they change. In order to continue that level of involvement, we conclude that father should have both more time overall and more overnight time each week. As noted above, the best interests of the children also include maintaining their bonds with both their families, which requires some longer visits as well as weekly frequency.

Accordingly, we modify the parenting schedule to give father parenting time from Wednesday after school to Sunday night at 7:00 p.m. every other week and from Wednesday after school until Thursday morning during the alternate weeks. Father will have the children during spring vacation beginning when the children are released from school and ending at 7:00 p.m. the evening before school resumes. The parties will each have an equal number of overnight visits during Christmas vacation. Each parent will have the children during Thanksgiving break in alternate years, and each parent will have two weeks' uninterrupted parenting time in the summer. Given the above modifications, we remand this case to the trial court to recalculate the parties' child support obligations in light of the new parenting schedule.

■ In his second assignment of error, father contends that the trial court erred in not awarding him all his attorney

fees. After the modification judgment was entered, both parties requested attorney fees pursuant to ORS 107.135(8).[6] The trial court made the following findings regarding the requests for attorney fees: "Neither party is in a position to readily pay even their own fees. Both parties pursued their positions in good faith. Mother's side of the aisle was more responsible for unnecessary attorney fees because of untimely responses." The trial court awarded an attorney fee of $750 to father.

Father argues that the trial court erred in not holding that mother pursued her position in bad faith and in awarding father only $750 of the $16,089 in attorney fees that he requested. Mother contends that father uses an inapposite standard for assessing bad faith; under the correct standard, according to mother, the trial court correctly concluded that both parties acted in good faith.

ORS 107.135(8) provides that, in a proceeding to modify parenting time or child support,

"the court may assess against either party a reasonable attorney fee and costs for the benefit of the other party. If a party is found to have acted in bad faith, the court shall order that party to pay a reasonable attorney fee and costs of the defending party."

The parties first debate the standard of review that we should apply in resolving this assignment of error. Father argues that we should apply a *de novo* standard of review to any factual findings related to attorney fees, just as we apply a *de novo* standard of review to other factual findings in domestic relations cases. In father's view, we are accordingly not bound by the trial court's finding that the parties acted in good faith. Mother contends that we should review trial court "decisions" on attorneys fees for abuse of discretion.

■ We first observe that "abuse of discretion" is never an apposite standard of review for findings of fact. "Discretion" refers to the authority of a trial court to choose among several legally correct outcomes, *State v. Rogers*, 330 Or 282, 310-12,

---

[6] At the time that this case was briefed, the statutory citation was ORS 107.135(7). This statute was renumbered by Or Laws 2003, ch 116, § 4, but its substance was unchanged.

4 P3d 1261 (2000), and accordingly "abuse of discretion" is a standard of review that applies only to certain legal rulings, never to factual findings. It appears that the question of the correct standard of review to apply to findings of fact underlying decisions on whether to allow attorney fees is a question of first impression. Whether we would review those findings *de novo*, because this is a domestic relations case, or defer to the trial court's findings is an interesting question, but one we need not decide in this case, because, on appeal, the parties raise a question of law. Specifically, that question is, given facts about which the parties do not argue on appeal, was the trial court legally correct that mother did not act in bad faith? We review the trial court's conclusion on that question for errors of law.[7] If, as a matter of law, mother acted in bad faith, an award of attorney fees would be mandatory. ORS 107.135(8) (if a party acts in bad faith, trial court "*shall*" order attorney fees).

Father argues that he was entitled to attorney fees because mother lacked diligence in pursuing settlement of the dispute and preparing the form of the modification order and that lack of diligence constituted "bad faith." To define "bad faith," he relies on *OUS v. OPEU*, 185 Or App 506, 515, 60 P3d 567 (2002), in which we indicated that "bad faith" in the context of performance of a contract might include lack of diligence. Mother contends that "bad faith" in ORS 107.135(8) should have a meaning similar to that in ORS 20.105(1) (1993), another attorney fee statute that historically contained a "bad faith" standard.[8] The Supreme Court has construed ORS 20.105(1) (1993) to require "meritlessness [as] a necessary precursor" to bad faith. *Mattiza v. Foster*, 311 Or 1, 8, 803 P2d 723 (1990). According to mother, her positions and actions were not meritless, and so the trial court did not err in concluding that she did not act in bad faith.

---

[7] Mother does not argue on appeal that the trial court's award to father of $750 of his attorney fees was erroneous. We note that, if mother had challenged the allowance of attorney fees to father, it appears that the trial court allowed father attorney fees under the first sentence of ORS 107.135(8). Because that sentence does not include a legal standard, and because of the discretionary language of that sentence (trial court "*may*" assess attorney fees against either party), we would review allowance for abuse of discretion.

[8] ORS 20.105(1) was amended in 1995 and no longer contains a bad faith standard. Or Laws 1995, ch 618, § 2.

■ We agree with mother that "bad faith" in ORS 107.135(8) should be interpreted similarly to "bad faith" in ORS 20.105(1) (1993). As the Supreme Court explained in *Mattiza*, a claim or position is in bad faith under ORS 20.105(1) (1993) when it is meritless, that is, "it was entirely devoid of legal or factual support at the time it was made." 311 Or at 8 (footnotes omitted). Under that standard, the trial court's conclusion that mother did not act in bad faith was legally correct.

Parenting schedule modified: Father to have parenting time from Wednesday after school to Sunday night at 7:00 p.m. every other week and from Wednesday after school until Thursday morning in alternate weeks; father to have parenting time during spring break starting when children are released from school and ending at 7:00 p.m. the evening before school resumes; each parent to have equal number of overnights during Christmas vacation; parents to alternate Thanksgiving vacations; each parent to have two weeks' uninterrupted parenting time in the summer. Remanded for modification of child support. Otherwise affirmed.