175 P.3d 1017 (2008)
217 Or. App. 430
In the Matter of M.P.B., S.D.B., and S.J.B., Minor Children.
T.H., G.B., and S.N., Respondents,
v.
M.P.B., S.D.B., and S.J.B., Appellants.
J040072 to J040074, 04028J to 04030J, A135791.
Court of Appeals of Oregon.
Argued and Submitted November 1, 2007.
Decided January 23, 2008.
*1018 Kathryn Underhill argued the cause and filed the brief for appellants.
No appearance for respondents.
Before EDMONDS, Presiding Judge, and BREWER, Chief Judge, and WOLLHEIM, Judge.
BREWER, C.J.
In this guardianship proceeding, M.P.B., S.D.B., and S.J.B. (the children) appeal from a second supplemental judgment that modified their parenting time with their mother. They assign error to the requirement in that judgment that they have visits with mother that last longer than four hours at a time.[1] On de novo review, ORS 419A.200(6)(b), we modify the second supplemental judgment to eliminate its provision for overnight visits but retain daytime visits at the level that the judgment requires.
We begin with the procedural history of the case and then turn to the evidence adduced at the hearing on the children's motion to reduce their required parenting time. On February 6, 2004, while the children were living with her, mother was taken to the hospital with an apparent methamphetamine overdose. After that incident, the Department of Human Services (DHS) placed the children with their maternal grandmother, with whom they previously had often lived and with whom they have remained ever since. On February 9, DHS filed petitions asserting that the children were within the jurisdiction of the juvenile court because of circumstances that endangered their welfare. In support, the petitions relied both on mother's drug use and on her mental illness. At the same time, DHS filed an affidavit that described mother's apparent methamphetamine overdose on February 6, 2004, and previous DHS contacts with mother and that asserted that mother's home was unsanitary and not fit to be the children's residence.
On April 9, 2004, the juvenile court found that the children were within its jurisdiction, after determining that mother had suffered a drug overdose and that her mental illness interfered with her ability to parent the children. The court did not rule on the allegation that mother's drug problems interfered with her ability to parent. The court also found that the children's father was not available to care for them. On April 21, 2005, the court entered a judgment appointing grandmother as the children's guardian. In *1019 doing so, it noted that DHS, mother, and father all supported the guardianship.
In the judgment creating the guardianship, the court established parenting time of a minimum of two contacts per parent each month, totaling four hours per parent, and required that. DHS supervise the visits for at least the first 90 days.[2] The court stated that its goal was to work toward unsupervised parenting time. On November 1, 2005, the court entered a supplemental judgment in which it expanded parenting time for both parents. For father, the court specified parenting time of one weekend per month beginning in October 2005, together with one overnight visit during the Thanksgiving holiday, two overnight visits during the Christmas holiday, and 10 uninterrupted days each summer. The court established the same schedule for mother, except that the weekend overnight visits would not begin until January 2006. Before then, she was to have visits of four hours in October, eight hours in November, and 12 hours in December. The court conditioned mother's parenting time on maintaining a safe and stable home, continuing mental health counseling, taking recommended medications, and not delegating child care to unsafe persons. There have been no changes to father's parenting time since that supplemental judgment was entered and that arrangement is not before us on appeal.
On March 10, 2006, the children filed a motion to modify the supplemental judgment, in which they sought to reduce their parenting time with mother to two four-hour supervised visits a month. In support of the motion, their attorney filed an affidavit reporting the children's allegations of a number of problems with mother's conduct and with her home. The court set a hearing on the motion for July 5, 2006. On June 30, mother moved to continue the hearing, agreeing as part of that motion to end overnight visits and otherwise to limit visitation as the children had requested until the court ruled on the motion to modify. After some further delays, on May 7, 2007, the court held a hearing on the motion to modify. The children testified in camera, without the parents and witnesses present; grandmother, mother, and D.G., mother's friend, testified in open court.
At the conclusion of the hearing, the court retained overnight visitation for mother with conditions in addition to those set out in the first supplemental judgment. The additional conditions included that D.G. or another suitable adult, acceptable to both mother and grandmother, be present and that the children not be exposed to anyone who was involved in criminal activity, drug use, or who was on parole or probation. The court did not require supervision between 9:00 a.m. and 5:00 p.m. The court also addressed other matters that the parties raised by establishing rules concerning the children's telephone contact with their parents and with grandmother, and the court prohibited grandmother and mother from making disparaging comments about each other when the children were' present. Those provisions are not in issue on appeal.
On May 22, 2007, the court entered a second supplemental judgment that embodied its decision on the motion to modify. The children filed a notice of appeal from that judgment on May 29.
On de novo review, we find that the evidence at the May 7 hearing established the following facts. At the time of the hearing, the children were 14, 13, and 8 years old. Since 1999, they have lived most of the time with grandmother, including the period before February 9, 2004, when DHS formally placed them with her. During that period, mother, who is presently in her late forties, has experienced serious difficulties that include mental illness and the use of methamphetamine and possibly other illegal drugs. At the time of the hearing, mother's income consisted of a small disability payment, supplemented by a rent subsidy and food stamps. A corporate payee receives mother's income, pays her bills, and gives her a small weekly allowance; mother is satisfied with that arrangement, which has provided financial stability that she did not previously have. She also receives occasional assistance from her oldest son, who is in his late twenties *1020 and is the child of a previous marriage. Mother's oldest child, a daughter who was also a child of that marriage, died in 2003.
In part because of her limited resources, mother has lived in a series of apartments near the downtown area of Albany. The children describe those apartments as being in poor physical condition. In addition, mother failed to keep the apartments minimally clean, leaving them full of dirty dishes and moldy food, with items of various sorts piled on the floor and furniture.[3] The children describe mother's acquaintances, who were frequent visitors to the apartments where she lived, as including "creepy" people who "twitch[ed] a lot" and looked like "druggies." At times, when the children arrived at mother's apartment for a visit, they had to empty the sofa to find a place to sit and had to create a path through the living room to reach the bathroom, kitchen, and bedroom. Mother did not always provide adequate food for the children, even for overnight visits, although she had sufficient resources to do so. At least once, all they had to, eat was a bag of chips. Mother often let the cat litter box overflow, with an accompanying offensive odor.
Mother's apartments had limited places for the children to sleep; it could be difficult for them even to clear a place on the living room floor for that purpose. They sometimes slept in a bed with others; on at least one occasion the three children shared a dirty bed with mother and a couple who were mother's friends. When mother had access to a car, she drove it in ways that frightened the children; at least once, the oldest child had to drive the car. Mother also shoplifted in front of the children at a Wal-Mart store and at a physician's office.[4] In her conversations with the children, mother complained about grandmother and about her lack of parenting time. At times, she focused on her deceased oldest daughter in a way that made the children, who apparently did not know their half-sister very well, uncomfortable. At the visit immediately before the hearing, mother provoked a yelling match with S.D.B., the middle child, telling her that she needed therapy because grandmother and S.D.B.'s uncle had led her to block her feelings about her half-sister's death. There is no evidence supporting those statements.
Mother did not seriously dispute that the overall picture that the children described was accurate in the past. She explained that she was depressed and that things easily overwhelmed her. However, she also testified that she recently had made substantial changes in her life. According to mother, she last used methamphetamine in July 2005. She is in continuing mental health therapy that has brought her mental illness under control, in part through counseling and in part through medications. Mother described the medications that she takes and the purpose of each; she expects to need to continue taking those or similar medications for the rest of her life. About a year before the hearing, while she was living in her last apartment, mother became friends with D.G., another resident of the same apartment complex. D.G. now describes mother as her best friend. The children have met her and like her. D.G., in turn, describes the children's interactions with mother as normal and happy.
Some months after she and mother met, D.G. moved from the apartment complex where they met to another complex in a better location. Between the children's last visit with mother and the date of the hearing, mother also moved out of her apartment in that complex and temporarily moved in with D.G. Mother testified that she was scheduled to move into a larger duplex with a yard in a nicer area of town and that she was staying with D.G. until that duplex became available. Mother looked forward to being able to bike and participate in other outdoor activities with the children at that location. She testified that she recently had taken much better care of her apartment, although she conceded that she "went through some clutter" *1021 in early March, around what would have been her oldest daughter's thirtieth birthday. She was proud, however, that she did not have to go to a halfway house for a couple of weeks at that time, as she had previously done on her daughter's birthdays.
The relationship between the children and mother appears to be reasonably good. At the time of the hearing, the children visited mother, without supervision, from 9:00 a.m. to 5:00 p.m. on the Saturday and Sunday of the second weekend of each month. Both the first and second supplemental judgments provide for visitation from Friday evening until Sunday evening of that weekend. Thus, the children presently visit mother for much of the waking time that the court ordered. D.G. testified that mother is always excited when the children are scheduled to come and that the children are generally attentive to mother, showing appropriate affection for her. On the other hand, mother at times gets into disputes with the children beyond normal child-parent interactions. The subject is most often mother's desire for more visitation than what grandmother or the children want or mother's concern that they do not share her feelings about their deceased half-sister. At one point, mother would not allow the children to call grandmother while they were on a visit; in response, grandmother gave the youngest child a cell phone to hide in his backpack. Some of the rules that the court established are a result of that situation.
On appeal, the children assign error to the portion of the second supplemental judgment that provides for parenting time that is greater than two four-hour visits a month. They do not raise any issues concerning the other provisions of the judgment, and we therefore affirm those provisions without discussion. In explaining its decision to retain full weekend visits, including overnight stays, the trial court first stated that it was convinced that mother loves her children and has taken positive steps to turn her life around, something that was not easy for her to do. The court recognized that the children had been uncomfortable many times in the past and were concerned about some of the things that had gone on while they were with mother. The court nevertheless concluded that it was in the best interests of the children to have overnight visitations with mother if D.G. were actually present to supervise them during the entire night. The court did not require supervision from 9:00 a.m. to 5:00 p.m. The court explained,
"I know that it may be uncomfortable for a while, but Mother has changed her address, where she's living now should be a lot more comfortable for the children to have and to feel safer in that location. And for the children's long term development, it's important that they have a relationship with their mother as long as it can be a positive one."
The court did modify the previous supplemental judgment to delete the 10-day interrupted summer visits because it did not think that the parties were ready for them. The court concluded by telling mother that it was operating on the assumption that the changes that she had described were in place and that her living situation was no longer unsafe. If the children again felt unsafe, the court explained, they could bring that problem to the court's attention.
Before evaluating the children's assignment of error, we will describe the statutory framework pertaining to the modification of a guardianship judgment. After holding a permanency hearing under ORS 419B.476, a court may approve a plan of guardianship and grant a motion for guardianship if the court finds by a preponderance of the evidence that:
"(a) The child cannot safely return to a parent within a reasonable time;
"(b) Adoption is not an appropriate plan for the child;
"(c) The proposed guardian is suitable to meet the needs of the child and is willing to accept the duties and authority of a guardian; and
"(d) Guardianship is in the child's best interests. In determining whether guardianship is in the child's best interests, the court shall consider the child's wishes." *1022 ORS 419B.366(5).[5] No party challenges the court's appointment of grandmother as the children's guardian under this statute.
As part of the judgment[6] establishing a guardianship, the court may determine whether visitation[7] or other contact between the child and the child's relatives is in the child's best interests and may specify the nature and frequency of that visitation. ORS 419B.367(2)(a). The trial court acted under that authority when it determined the amount of mother's parenting time in this case.
An original guardianship order is subject to modification on the court's own motion or on the motion of a party. ORS 419B.368(1). The only requirement is that the court find the modification to be in the child's best interests. ORS 419B.368(2). ORS 419B.368(5) provides that, in deciding whether the child's best interests require a modification, the court may consider, among other things:
"(a) The child's emotional and developmental needs;
"(b) The child's need to maintain existing attachments and relationships and to form attachments and relationships, including those with the birth family;
"(c) The child's health and safety; and
"(d) The child's wishes."
In this case, the trial court adjudicated the children's motion to modify a previous guardianship judgment that provided for parenting time. Because the children seek to change the existing terms of the judgment, they have the burden of showing that the modification is in their best interests.[8]See OEC 305 (party has burden of persuasion as to each fact that is essential to the claim or defense that the party is asserting); cf. ORS 419B.366(2) (providing that facts supporting findings under that sectionrelating to creation of a guardianship"must be established by a preponderance of evidence"). We conclude that they have made such a showing with respect to the overnight visits but that they have not done so as to the length of their current daytime visits or to the unsupervised nature of those visits.
Because the sole statutory condition for a modification of a guardianship order is that the modification be in the best interests of the child, there is no requirement that the court find a change of circumstances before modifying a parenting time provision. Rather, the issue is whether a modification of parenting time will benefit the children. See Cole v. Wyatt, 201 Or.App. 1, 7, 116 P.3d 919 (2005); Ortiz and Ortiz, 101 Or.App. 362, 365, 790 P.2d 555, aff'd, 310 Or. 644, 650, 801 P.2d 767 (1990). In our de novo review of the trial court's decision in that regard, we give weight to its ability to observe the witnesses and will not lightly disturb its assessment of the children's best interests. See Shelton and Shelton, 196 Or.App. 221, 230, 100 P.3d 1101 (2004), adh'd to on recons., 197 Or.App. 391, 105 P.3d 944 (2005) (stating rule in dissolution cases). Nevertheless, the decision is ours on de novo review.
In this case, we agree with the trial court that mother has begun to make substantial positive changes in her life, but, in our view, too many of the changes that mother described are things that she hoped to do rather than things that she actually had accomplished at the time of hearing. If mother fulfills her intentions, overnight visits may *1023 well become appropriate, but they are not presently in the children's best interests.
Our fundamental concern is with the children's welfare and safety; we also give weight to their expressed wishes. The problems that the children described with mother's home environment and with her care of them are substantial and worrisome.[9] Those problems went well beyond the normal mishaps and disorder that may occur in any household. It is one thing to have somewhat messy living quarters; it is another to permit such clutter that the children must take it on themselves to make spaces in which they can move. It is one thing to have limited food choices for the children; it is another to have only a bag of chips for them to eat. It is one thing to have limited sleeping space; it is another to allow mother, three children, and two strangers to share a dirty bed. Those circumstances are signs of mother's ongoing instability and her difficulty in assuming a parental role with children who are moving into their teen years. To some extent, mother looks to the children to satisfy her needs rather than seeing her role as responding to their needs and, consistently with that outlook, at least the two older children assume adult roles when they are with her. The children describe the problems as ongoing. Even assuming that they underestimate the extent to which mother has improved, the children do not feel safe spending the night with her. Their concerns in that regard are reasonable. The weight of the evidence is that requiring overnight visits is not currently in the children's best interests.
Although at the time of the hearing the conditions at mother's home and in her life had improved from their nadir, her situation remained very much in flux. She had moved out of an apartment and was waiting to move into a duplex. It was uncertain whether that change would fulfill mother's optimistic hopes for it and, if so, how long the improvement would last. Mother's friendship with D.G. and her apparent severance of her relationships with the people who properly concerned the children, are certainly positive signs. In addition, mother's mental health condition has improved, largely as a result of her therapy and medications. Mother's statements also suggest that she is now more aware of what she needs to do to act in the children's best interests while they are with her. Those statements and other changes support the extended unsupervised daytime visits that the trial court ordered. However, it is premature to require overnight parenting time at present. Too many of the changes that are necessary for such visits are things that mother hopes to implement, not things that have already occurred.
The trial court recognized the continuing problems that we have identified and warned mother about the need to continue the improvement that she had begun. The court sought to deal with the risks inherent in overnight visits in large part by requiring that D.G. or some other acceptable adult be present at those times to ensure that the children were safe. However, with due respect for the trial court's thoughtful perspective, in our view, that solution is not adequate. Assuming that D.G. is willing to undertake the responsibility that the court gave hersomething that the court did not attempt to determinethere is no evidence that she has any relevant training or that she would be able to put the children's safety and welfare ahead of the wishes of mother, her best friend, should they diverge. Although the court alternatively authorized some other acceptable person to fill that role in D.G.'s stead, it did not identify any such person; given the strain in the relationship between mother and grandmother, it would be difficult for them to agree on an alternative person.
Because we cannot approve the trial court's solution to the problems that it identified, we must evaluate the children's interests based on the circumstances that appear in the record. For the reasons set out above, we conclude that the children have carried their burden of persuasion that overnight visits are not presently in their best interests. We therefore modify the second supplemental judgment to eliminate that provision.
*1024 Paragraph B of second supplemental judgment modified to provide: "Mother shall have parenting time on the second weekend of each month from 9:00 a.m. to 5:00 p.m. on Saturday and from 9:00 a.m. to 5:00 p.m. on Sunday on the condition that the children will not be exposed to or have contact with any individual engaged in criminal activity, drug use, or on parole or probation." Affirmed as modified.
NOTES
[1] The children's father and their maternal grandmother and guardian are also respondents. They have not appeared on appeal; at the trial court they supported the children's position.
[2] DHS gradually withdrew from involvement in the case; it did not participate in the May 7, 2007, hearing that resulted in the supplemental judgment at issue here.
[3] The children's descriptions are consistent with the affidavit that DHS filed in February 2004 when it sought to bring the children within the jurisdiction of the juvenile court.
[4] Mother went to the physician because she had accidently stuck herself with a hypodermic needle that was in her coat pocket.
[5] All of our references to the statutes are to the 2005 versions, which were in effect when the trial court acted. The 2007 legislature amended the statutes by replacing the word "child" with the word "ward." Or Laws 2007, ch 333, §§ 2 to 4.
[6] The statutes that we discuss refer to a guardianship "order," while the trial court labeled each of its actions a "judgment." We treat those judgments as being the orders that the statutes contemplate. ORS 419A.200(1) provides for the appeal of a "judgment" in a juvenile court proceeding, while ORS 419A.200(8) also refers to an appeal from a "final order." The second supplemental judgment from which the children appeal is appealable whether it is a judgment or a final order.
[7] The statute and older cases use the term "visitation," while the court and the parties use the more recent phrase "parenting time." We treat the two as referring to the same thing.
[8] We need not decide what, if any, burden of persuasion exists when the court acts on its own motion to modify a guardianship order.
[9] We recognize that mother has limited resources. The problems that we describe, however, do not appear to be the result of that situation.