Argued and submitted January 15, affirmed October 8, 2008

In the Matter of the Marriage of

Laura Lee DAHL,
*Petitioner-Respondent,*

*and*

Darrell Lee ANGLE,
*Respondent-Appellant.*

Clackamas County Circuit Court
DR04090713; A133697

194 P3d 834

Mark Johnson argued the cause for appellant. With him on the briefs was Johnson Renshaw & Lechman-Su PC.

William J. Howe, III, argued the cause for respondent. With him on the brief was Gevurtz Menashe Larson & Howe PC.

Before Armstrong, Presiding Judge, and Rosenblum, Judge, and Carson, Senior Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

In this marital dissolution case, husband appeals a dissolution judgment that ordered the destruction of six cryo-preserved embryos (frozen embryos)[1] that were formed using husband's sperm and wife's eggs and that have been held in storage at Oregon Health and Science University (OHSU). For the reasons stated below, we affirm.

■    Although we review the evidence *de novo*, ORS 19.415(3), we will defer to the trial court's implied and express credibility findings. *Olson and Olson*, 218 Or App 1, 3, 178 P3d 272 (2008). Husband and wife married in March 2000. Wife bore one son, J, whom she and husband conceived by traditional means. In May 2004, the parties decided to try to conceive a child through *in vitro* fertilization (IVF), which involved OHSU staff harvesting eggs from wife, combining those eggs with husband's sperm to form embryos, and implanting some of the embryos in wife's uterus. After several failed attempts to implant embryos through that process, the parties discontinued that effort. Soon after, the parties decided to dissolve their marriage. The parties reached an agreement on all matters pertaining to the dissolution of their marriage except for one: the disposition of six frozen embryos that remained from the IVF process.

At the time of the IVF procedure, the parties and OHSU executed an Embryology Laboratory Specimen Storage Agreement (agreement) that detailed the terms of

---

[1] Although we generally adopt the parties' use of the term "embryo" in this opinion to refer to a fertilized egg that has not been implanted in a uterus, the medically accurate term for an egg in that state is a "preembryo" or "prezygote." *See* Elizabeth A. Trainor, J.D., *Right of Husband, Wife, or Other Party to Custody of Frozen Embryo, Pre-Embryo, or Pre-Zygote in Event of Divorce, Death, or Other Circumstances*, 87 ALR 5th 253, 260 (2001). A preembryo develops into an embryo only after implantation into a woman's uterus. *Id.* The parties here did not present evidence at trial of the embryos' stage of development. However, the appendix to the agreement that the parties entered with Oregon Health and Science University identifies the embryos as cleaving embryos, as distinguished from zygotes and blastocysts. In all events, the embryos are those that were not implanted in wife.

In addition, the term "frozen embryos" is a term of art for preembryos that have been cryogenically preserved. *Id.* The six embryos at issue in this case are, technically speaking, frozen embryos; because we need not differentiate between frozen and unfrozen embryos, we likewise use the term "embryo" to refer to frozen embryos.

storage of embryos created through the IVF procedure. Section 5 of the agreement addressed the parties' ability to transfer and dispose of the embryos. As is relevant here, that section provides:

> "In connection with requests for transfer of the Embryos or upon termination of this Agreement, UNIVERSITY is hereby irrevocably authorized and directed to transfer or dispose of the Embryos as follows:

> "A.  In accordance with the written joint authorization of CLIENTS pursuant to the terms of this Agreement, or if one of said CLIENTS is deceased (as established by a certified copy of a death certificate) in accordance with the surviving CLIENT'S such authorization; or

> "B.  *If the CLIENTS are unable or unwilling to execute a joint authorization,* the CLIENTS hereby designate the following CLIENT or other representative to have the sole and exclusive right to authorize and direct UNIVERSITY to transfer or dispose of the Embryos, pursuant to the terms of this Agreement[.]"

(Emphasis added.) Directly below paragraph 5B, wife's name is printed in a space designated "Name," and, next to wife's name, her initials ("LD") and husband's initials ("DA") appear in spaces designated for the parties' approval. Below that, the following paragraph states:

> "Provided however, prior to any transfer/thaw in accordance with the foregoing, if any court of competent jurisdiction shall award to either CLIENT all rights with respect to the Embryos to the exclusion of the other CLIENT, by an order or decree which is final and binding as to them, then UNIVERSITY shall have the right thereafter, whether or not a party to the proceedings in which such order or decree is issued, to deal exclusively with the CLIENT to whom such rights were awarded, without liability or accountability to the other CLIENT."

Paragraph C then sets forth steps that OHSU will take to dispose of the embryos in the event that (1) the parties refuse to comply with the provisions in paragraphs A and B, (2) either party fails to comply with provisions of the agreement within 60 days of written demand from OHSU, or (3) both parties die. Those steps entail, first, OHSU using reasonable efforts to accomplish up to three alternatives,

with the first two requiring the approval of husband and wife. The first alternative provides for OHSU to donate the embryos to another woman who is attempting to initiate a pregnancy, in which case both husband and wife would need to sign and have notarized a donation consent form and would waive and release any claims to the embryos or any resulting offspring. The spaces designated for the parties' election of that option are blank. The second alternative provides for OHSU either to donate the embryos to a recognized research facility approved by its Institutional Review Board or to use the embryos in its own laboratory. The initials "LD" and "DA" appear in the designated spaces below that alternative. Paragraph C then reads:

> "If neither alternative (1) or (2) is selected, or if UNIVERSITY has been unable to accomplish the selected alternative(s) in accordance with the foregoing, UNIVERSITY may thaw and discard the Embryos."

The final page of the agreement has the parties' signatures, which were executed and notarized on May 14, 2004. In addition, every page of the agreement has spaces for the parties' and the OHSU representative's initials; each of those spaces is marked with the initials "LD," "DA," and those of the OHSU representative.

Both wife and husband testified at a hearing in the dissolution proceeding on the disposition of the six embryos. Wife testified that, when she and husband signed the agreement, they had intended to use the embryos to create a child for themselves as a married couple and did not intend to use the embryos if they were no longer married. She further stated that they had discussed what would happen to any embryos that were not used by them and had agreed that they would donate the embryos to a facility for scientific research. Her understanding of the agreement was that, if she and husband disagreed on the disposition of the embryos, she would have sole and exclusive right to direct OHSU to transfer or dispose of the embryos. She opposed having the embryos donated to another woman for implantation. She expressed concern that, if the embryos were successfully implanted, then the resulting offspring might eventually attempt to contact J, as his or her genetic sibling. In addition,

she did not want to produce another child with husband, and she stated that, if she were to produce more children genetically, she would not want someone other than her to raise them.

Husband denied having initialed or read the OHSU agreement, and stated that he had signed the last page of the document without a notary present and without having seen the rest of the document. He said that he believed that the "embryos are life," and opposed their destruction or donation to science because "there's no pain greater than having participated in the demise of your own child." Accordingly, he wished to have the embryos donated to others who were attempting to conceive. He testified that he would do "everything" to protect wife's and J's confidentiality related to the donation of the embryos, but acknowledged that he could not guarantee their anonymity.

After hearing the parties' testimony, the court found that the OHSU agreement "is the agreement of the parties," that both parties had signed the agreement with a notary present, and that it did not believe that husband was being untruthful but, rather, that husband had an inaccurate recollection of signing the consent form. The court then ordered, based on the parties' positions, that the embryos be destroyed. However, it further stated that, if the parties jointly agreed that the embryos should be donated to medical research, then the court would honor that decision for the embryos' disposition.[2] The court subsequently issued a dissolution judgment, which included an order that the embryos be destroyed.

Husband appeals, assigning error to the trial court's order that the embryos be destroyed. He urges us to award the embryos to him, over wife's objection, under our authority to make a just and proper distribution of the parties' property. Because he views the embryos as living things that he does not

---

[2] It is not clear whether the trial court, when it issued the order to destroy the embryos, was enforcing the IVF agreement (either by issuing an order in accordance with wife's desire to avoid parenthood, or in accordance with the alternatives selected by the parties when they signed the agreement), or was balancing the interests of the parties and concluding that wife's interest in avoiding genetic parenthood was more compelling than husband's interest in preventing the destruction of the embryos by donating them to others for implantation.

want killed, husband argues that it is just and proper for the court to award the embryos to him because his desire to preserve what he believes to be life should be considered more important than wife's desire to avoid having a child born from one of her eggs. Wife responds that the court lacks authority to interfere with her decision because the embryos are not property and, thus, are not subject to court disposition in a marital dissolution proceeding. Ultimately, however, she urges us to affirm the trial court's order to have the embryos destroyed or, provided husband agrees, donated for research purposes, in effect enforcing the agreement that the parties signed at the time of the IVF procedure. In the alternative, wife argues that, even if the embryos are subject to court disposition as property, the court cannot award decision-making authority in a way that could result in the birth of a child over the objections of a source of the genetic material.

■　　　We summarize the issues in this case, which are questions of first impression in Oregon, as follows: *First*, does a contractual right to dispose of embryos that have been created during a marriage and cryopreserved for potential later use constitute personal property under ORS 107.105(1)(f) that is subject to the court's authority to distribute in a subsequent dissolution proceeding? *Second*, if the court has such authority, what constitutes a distribution of that property that is "just and proper in all the circumstances"?

■■　　　Although our review of the evidence in dissolution cases is *de novo*, the first question—whether a contractual right to dispose of embryos is personal property that is subject to disposition in a dissolution case—presents a legal question that we review for legal error. *See Shelton and Shelton*, 196 Or App 221, 234, 100 P3d 1101 (2004), *adh'd to on recons*, 197 Or App 391, 105 P3d 944 (2005) (reviewing question of law in dissolution case for legal error). ORS 107.105 lists the subject matter over which the court has authority to enter a judgment in a dissolution proceeding. That statute provides, in part:

> "(1)　Whenever the court renders a judgment of marital annulment, dissolution or separation, the court may provide in the judgment:
>
> "* * * * *

"(f) For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances."

ORS 107.105. Marital property "constitutes the entire class of property subject to the dispositional authority of the court in a marital dissolution action." *Massee and Massee,* 328 Or 195, 206, 970 P2d 1203 (1999). Given the statutory language, we first must determine whether the contractual right to dispose of frozen embryos is "personal property" for purposes of the statute. If it is not, then the court has no authority in a dissolution proceeding or judgment to deal with those contractual rights.[3] If the court does have such authority, we will need to determine what distribution of that property is just and proper in all the circumstances.

Our courts have had few occasions to explore the meaning of "personal property" in ORS 107.105(1)(f). The Oregon Supreme Court looked to a dictionary definition of property when it determined that appreciation of one party's separately held assets was property, stating that " 'property' means something that is or may be owned or possessed, or the exclusive right to possess, use, enjoy, or dispose of a thing." *Massee,* 328 Or at 206 (citing *Webster's Third New Int'l Dictionary* 1818 (unabridged ed 1993)). Notwithstanding the apples-to-oranges comparison between appreciation of assets and an intangible contractual right to dispose of frozen embryos, the latter right appears to fit within that admittedly broad definition. As shown by the agreement, the parties have rights to direct the facility holding the embryos to transfer or dispose of them through implantation, donation to another woman, donation to a research facility, or destruction.

Indeed, although the language of the embryo storage agreement does not control what constitutes personal property under ORS 107.105, it does indicate that the parties

---

[3] The parties do not contend that any statutory provision other than ORS 107.105(1)(f) confers on the court in a dissolution proceeding the authority to deal with contractual rights involving the distribution of frozen embryos. Our independent review of ORS 107.105 and related statutes leads us to conclude that there is no other statutory provision that could be a source of authority for a court to deal with the contractual rights to dispose of frozen embryos in such a proceeding.

understood that husband and wife had the "exclusive right to possess, use, enjoy, or dispose of" frozen embryos that were stored under the agreement. Under a heading entitled "Storage," the agreement provides:

> "The UNIVERSITY will provide storage services for CLIENTS' personal property consisting of cryopreserved embryos (Embryos), which might later be used by CLIENTS in an effort to create a pregnancy."

Further, in the paragraph that follows the storage paragraph, under a heading entitled "Description of Embryos," the agreement provides:

> "CLIENTS represent and warrant that they have *lawful possession of and the legal right and authority to store* the Embryos under the terms of this Agreement."

(Emphasis added.)

We acknowledge that there is some inherent awkwardness in describing those contractual rights as "personal property," as we discuss in more detail below. However, we nonetheless conclude that the contractual right to possess or dispose of the frozen embryos is personal property that is subject to a "just and proper" division under ORS 107.105. The trial court did not err in treating it as such.

■ Given that conclusion, the question of what constitutes a just and proper distribution of that right presents a significantly more difficult question. The division of property rarely gives rise to this level of deeply emotional conflict and, notwithstanding the idea that some properties are unique and personally meaningful, a decision to award particular property to a party generally can be considered to be a decision that is ultimately measured in monetary (or equivalent) value. A decision about the contractual right to direct the disposition of embryos cannot reasonably be viewed that way, as the parties appear to agree. As such, our case law controlling the just and proper distribution of property in a marital dissolution proceeding—all of which addresses the distribution of property to which some sort of monetary value can be ascribed—offers little assistance in our task here. Nor can we identify any express source of public policy in our constitution, statutes, administrative rules, or elsewhere that could inform the distribution of property of this nature.

Given the dearth of Oregon legal authority to guide our inquiry, we look to legal authority from outside Oregon. As of this writing, eight other state appellate courts have confronted similar cases. While those cases are not controlling, several are instructive, and we briefly discuss them here.

The first reported marital dissolution case addressing the disposition of embryos is *Davis v. Davis*, 842 SW2d 588 (Tenn 1992). In that case, the husband and wife disagreed on how to dispose of embryos on the dissolution of their marriage. They had not signed an agreement with the IVF clinic regarding the storage of the embryos and, hence, had not resolved how they and the clinic would deal with contingent events. The Tennessee Supreme Court ultimately held that courts should resolve such disputes

"first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed."

*Id.* at 604. In that case, there was no agreement between the progenitors, so the court weighed the relative interests of the parties, determining that the husband's interest in not procreating outweighed the wife's interest in donating the eggs to another couple. *Id.*

*Kass v. Kass*, 91 NY2d 554, 696 NE2d 174 (1998), is the first reported marital dissolution case involving the disposition of embryos in which the parties had signed an agreement with the IVF facility concerning the storage of the embryos. In that case, the wife wanted to implant the embryos in an attempt to get pregnant, while the husband wanted to have the embryos donated for scientific research. The agreement with the IVF facility provided, among other things, that (1) the frozen embryos would not be released from storage without the parties' mutual written consent; (2) in the event of divorce, legal ownership of the stored embryos was to be determined in a property settlement by a court with jurisdiction; (3) in the event that the parties no longer wished to initiate a pregnancy or could not agree on the disposition of the embryos, then the parties elected to

donate the embryos for scientific research. *Id.* at 559-60, 696 NE2d at 176-77.

The New York Court of Appeals first noted that New York courts should generally presume that "[a]dvance directives, subject to mutual change of mind that must be jointly expressed," are valid, binding, and enforceable as between the progenitors. *Id.* at 565, 696 NE2d at 180 (citing *Davis*, 842 SW2d at 597). The court acknowledged the difficulty the parties faced in determining in advance their preferences for disposition in the event of contingent events, such as death, divorce, aging, or the birth of other children, but further explained:

> "Advance agreements as to disposition would have little purpose if they were enforceable only in the event the parties continued to agree. To the extent possible, it should be the progenitors—not the State and not the courts—who by their prior directive make this deeply personal life choice."

*Id.* at 566, 696 NE2d at 180.

The court then focused its inquiry on the agreement. The wife's only argument about the agreement was that it was ambiguous as to the parties' intent that the embryos be donated to science in the event of a divorce.[4] The court disagreed with the wife, concluding that, under New York case law, the agreement was unambiguous and manifested the parties' mutual intent at the time that they signed it that the embryos be donated for research. *Id.* at 569, 696 NE2d at 182. Accordingly, the court enforced the agreement and upheld the lower court's order that the embryos be donated for scientific research.

Several of the other courts confronted with disputes over embryos in cases in which the parties had signed an agreement with a medical facility for the disposition of stored embryos have adopted, or implicitly followed, the general framework set forth in *Davis* and *Kass*. *See, e.g., Cahill v. Cahill*, 757 So 2d 465, 468 (Ala Civ App 2000) (enforcing

---

[4] The court observed that, in some instances, such agreements might be unenforceable for violating public policy or due to significantly changed circumstances. *Kass*, 91 NY2d at 565 n 4, 696 NE2d at 179-80 n 4. The wife did not raise either of those issues, and the court declined to pursue them.

agreement stating that parties relinquished control of the embryos to the IVF facility on dissolution of marriage); *Roman v. Roman*, 193 SW3d 40, 50 (Tex App 2006), *rev den* (2007), *cert den*, 128 S Ct 1662 (2008) (ordering frozen embryos destroyed in accordance with IVF agreement); *Litowitz v. Litowitz*, 146 Wash 2d 514, 533, 48 P3d 261, 271 (2002), *cert den*, 537 US 1191 (2003) (same); *cf. A.Z. v. B.Z.*, 431 Mass 150, 159-60, 725 NE2d 1051, 1057 (2000) (determining that the agreement was unenforceable for public policy reasons while neither rejecting nor accepting *Davis* and *Kass* framework). Other courts require mutual contemporaneous consent by the parties. *See In re Marriage of Witten*, 672 NW2d 768, 783 (Iowa 2003) (enjoining any transfer of frozen embryos until parties reached consensus where agreement required parties' joint written consent); *J.B. v. M.B.*, 170 NJ 9, 29-30, 783 A2d 707, 719-20 (2001) (balancing interests of parties when parties contemporaneously disagreed).

■    We conclude that the general framework set forth by the courts in *Davis* and *Kass*, in which courts give effect to the progenitors' intent by enforcing the progenitors' advance directive regarding the embryos, is persuasive. Moreover, giving effect to a valid agreement evincing the parties' intent regarding disposition of embryos is consistent with our statutory and case law that give similar effect to prenuptial agreements and agreements made during a marriage. *See, e.g.*, ORS 108.700 to 108.740 (governing prenuptial agreements); ORS 107.104 (stating policy encouraging enforcement of marital settlement agreements); *Patterson and Kanaga*, 206 Or App 341, 347-48, 136 P3d 1177 (2006) (settlement agreements incorporated into judgments enforceable unless enforcement contravenes law or public policy).

Thus, on *de novo* review, we agree with the trial court's determination that the agreement evinced the parties' intent. The parties signed the agreement at the time that they participated in the creation of the embryos. The agreement provided that, in connection with requests for the transfer of the embryos or the termination of the agreement,[5]

---

[5] The agreement has a clause on its duration, which provides, in part:

"The term of this Agreement shall be for the period of one (1) year commencing upon the date of first freeze of zygotes or embryos, at the end of which time it shall automatically terminate, unless said date is extended prior to the

OHSU would transfer the embryos in accordance with the parties' joint written authorization. In the absence of such authorization, the parties designated wife to authorize and direct OHSU to act regarding the embryos. Although the agreement did not specifically state that the couple was selecting options for disposition of the embryos in the event of marital dissolution or separation, the parties contemplated the contingency of their not being able to reach agreement on the disposition of the embryos, and they selected wife to be the primary decision-maker in that regard. Further, the parties were given choices when they entered the agreement on possible disposition of the embryos. At that time, they did not choose to donate the embryos to another woman for implantation, the choice that husband now advocates; rather, they chose either to donate the embryos to science or to have them destroyed. In sum, the parties agreed that wife would decide the disposition of the embryos unless a court, in essence, overruled the parties' preference for a decision-maker and allocated that responsibility to a different party. The parties further understood that OHSU would either donate the embryos to a facility for scientific research or destroy them if the parties did not·comply with the agreement.

Husband does not argue that the agreement itself is ambiguous or invalid for public policy reasons. Rather, he asks that we award possession of (and decision-making authority over) the embryos to him, because his belief that the embryos are life and his desire to donate the embryos in a way that would allow "his offspring to develop their full potential as human beings" should outweigh wife's interest in avoiding genetic parenthood.

■     We reject husband's request. Again, while we review *de novo* the trial court's division of marital property, we review the award itself for the proper exercise of discretion. *See Kunze and Kunze*, 337 Or 122, 136, 92 P3d 100 (2004)

---

termination date by mutual agreement of all parties hereto in writing. The above notwithstanding, in the event that zygotes or embryos are not frozen within six (6) months of the signing of this agreement, the agreement [*sic*] shall be destroyed."

The record does not indicate whether the parties extended the term of the agreement; likewise, it is silent as to the date on which the "first freeze" occurred. However, the agreement was signed on May 14, 2004. Assuming that the first freeze occurred within six months of May 2004, the agreement had terminated by the time that the court held a hearing regarding the embryos, which was in June 2006.

(holding that the ultimate determination of what is just and proper is discretionary); *Olson*, 218 Or App at 14. Accordingly, based on our conclusion that courts should give effect to agreements showing the parties' intent for the disposition of frozen embryos, we will not disturb the trial court's decision unless it fails to comport with that framework.

We do not see how the court's decision to issue an order that the embryos be destroyed is not a disposition that is just and proper in all the circumstances. The trial court determined that the agreement showed the intent of the parties. Husband fails to advance, and we cannot identify, any affirmative countervailing state policy that would impose a genetic parental relationship on someone as a default principle. Nor does he identify any affirmative state policy favoring his preferred disposition of the embryos.[6] Given that, we have no basis on which to disturb the trial court's conclusion.

Absent a countervailing policy, it is just and proper to dispose of the embryos in the manner that the parties chose at the time that they underwent the IVF process. According to the agreement here, the parties designated wife to be the decision-maker regarding the embryos. Wife's stated preference for disposition of the embryos is expressed in the trial court's order to destroy them, absent husband's renewed agreement to donate them for scientific research. In issuing the order to destroy the embryos, the trial court essentially gave effect to the agreement. Accordingly, we do not disturb that decision.

Affirmed.

---

[6] Such policy would be found in legislative enactments, administrative rules, regulations, and the state and federal constitutions. *See Compton v. Compton*, 187 Or App 142, 145, 66 P3d 572 (2003) (citing *A-1 Sandblasting v. Baiden*, 293 Or 17, 22, 643 P2d 1260 (1982)). Oregon is not among the handful of states that have enacted legislation addressing state policy regarding decision-making authority over preembryos. *See, e.g.*, Cal Health & Safety Code § 125315 (West 2006) (requiring IVF providers to obtain informed and voluntary choice regarding disposition of unused embryos); Fla Stat Ann § 742.17 (West 2005) (requiring IVF agreement and prescribing decision-making authority absent such an agreement); La Rev Stat Ann § 9:121-133 (2008) (defining a human embryo as a "juridical person" that must be implanted); Mass Gen Laws Ann, ch 111L, § 4 (West Supp 2008) (requiring IVF providers to obtain informed and voluntary choice regarding disposition of unused embryos); NJ Stat Ann § 26:2Z-2 (West 2007) (permitting embryonic research, requiring informed and voluntary choice by parties regarding disposition).