**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 21, 2014**

# In the Court of Appeals of Georgia

A14A1424. ADVANCED TECHNOLOGY SERVICES, INC. v. KM DOCS, LLC et al.

BRANCH, Judge.

Advanced Technology Services, Inc. ("ATS"), filed suit against two former employees and the company the two men formed, asserting several claims arising out of allegations that the defendants used ATS trade secrets and confidential information improperly in their new business venture. The defendants removed the case to federal district court, which granted summary judgment in their favor on ATS's claim of copyright infringement and remanded the remaining claims to the Superior Court of Fulton County. The superior court granted summary judgment to the defendants on the remaining claims, and ATS appeals. For the reasons that follow, we affirm.

On appeal from the grant of summary judgment, appellate courts "conduct[ ] a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." *Shekhawat v. Jones*, 293 Ga. 468, 469 (746 SE2d 89) (2013); *Ga. Dept. of Corrections v. Developers Sur. & Indem. Co.*, 324 Ga. App. 371, 372 (750 SE2d 697) (2013).

Construed in favor of ATS, the record[1] shows that ATS, which now has five employees, develops and sells one product, a document management program called OptiDoc, for which it has approximately 44 customers. Miles Waldron began employment with ATS in February 2001 as the lead software developer, and in July 2003, he entered into a "Trade Secrets and Confidential Information Agreement" (the "Trade Secrets Agreement").[2] In the Trade Secrets Agreement, Waldron agreed that

---

[1] During the course of this appeal we denied ATS's motion to supplement the record with documents that were not before the trial court at the time of its decision. See generally *Demetrios v. State*, 246 Ga. App. 506, 510, (3), n. 14 (541 SE2d 83) (2000) ("we do not accept assertions of fact or evidence which were not before the trial court") (citation and punctuation omitted). The affidavits of August Donald Mischke dated February 6, 2013 and February 25, 2013, therefore, are not properly before us. We have excluded allegations of fact supported only by these affidavits.

[2] Waldron also entered into a "Non-Solicitation, Non-Disclosure, and Non-Competition Agreement" with ATS. But ATS did not raise any arguments concerning this agreement in its initial appellate brief, and this Court will not consider arguments

2

all software developed by ATS employees, with certain limitations not relevant here, is an ATS trade secret, constitutes confidential information, and is owned by ATS. He agreed not to remove any such information from ATS without permission, not to utilize it to create software for his own or a third party's use without permission and a license, and not to reveal it to a third party without permission. Waldron also agreed to return all ATS software and related information upon termination and to submit his computers and other devices to ATS for inspection in this regard.

While at ATS, Waldron personally rewrote most of the modules of ATS's OptiDoc system to create a new version. To do so, he kept the source code for OptiDoc on his work computer, but he sometimes worked on the source code at home using his personal computers and a computer he built for the purpose of performing ATS work at home. An ATS employee averred that Waldron built the computer after November 2009, and that he would bring it to work, "hook it up and use it during the day, and take it home each day at the end of the day."

In March 2009, ATS hired Harvey Heath to work in sales. Later in 2009, Waldron, at Heath's request, enhanced the OptiDoc software to allow a person to

---

raised for the first time in a reply brief. *Vann v. Finley*, 313 Ga. App. 153, 154, n. 2 (721 SE2d 156) (2011); *Hooks v. Humphries*, 303 Ga. App. 264, 269, (4), n. 8 (692 SE2d 845) (2010).

continue working without having to log in repeatedly; the parties referred to this enhancement as a "secret" or "pop-up viewer" module. ATS alleges that Waldron did not tender this software to ATS when he resigned. The allegation is based on one sentence in an email from Waldron to ATS's president in which Waldron said, "There is already a top secret built in way to make our viewer pop up without forcing a login[;] I did this for [Heath] some time ago."

In June 2009, while both men were employed by ATS, Heath reserved a web domain in the name of "www.kmdocs.com." In September, the two men established an entity named KM Docs, LLC, in order to take advantage of a business opportunity that Heath had learned about and conveyed to Waldron. During that month, without informing ATS or seeking permission, Waldron wrote a custom software "bridge" application on behalf of KM Docs for a document management system company; Waldron admitted that the customer might have been a competitor of ATS. Heath and Waldron split the $5,000 paid by the customer for the work. Waldron used his personal computers to do the work, but not the custom computer that he used for ATS work. Waldron denied using any ATS software to develop the bridge application.

There is also evidence that beginning in September 2009, Waldron repeatedly told an ATS co-worker, "I have something in the works that I am working on. I can't

say anything else, but you will be taken care of." And after that time, Waldron was uncharacteristically unproductive in his work for ATS, and he increasingly asked to work from home.

Waldron resigned his employment at ATS on June 1, 2010. He testified that he deleted the ATS source code from his personal computer shortly thereafter, although the exact date is uncertain. After resigning, Waldron continued to perform some additional work for ATS over the course of the following few weeks. In that regard, Waldron requested that he again be allowed access to the ATS source code, which was granted for that purpose. Heath, who never signed any written agreements related to his employment at ATS, resigned on July 7, 2010.

Within a day or two after Heath's resignation, Waldron and Heath launched a website for KM Docs, and Waldron began programming "docUnity," a document management system, and docDNA, a related module, for KM Docs.[3] Waldron admits that the docUnity software provides some similar functions as ATS's OptiDoc software. Waldron avers that he did not start programming docUnity until after July 7, 2010, when Heath left ATS. But a docUnity website states that docUnity was

_____

[3] KM Docs initially was owned by Heath and Waldron. A company named docUnity, LLC later purchased the assets of KM Docs. Waldron and Heath each own 35 percent of docUnity and an investor owns 30 percent.

formed in 2009 and that since its inception, Waldron "has been focusing on the development of [the] docUnity [document management system] from a strategic and technical design perspective." KM Docs/docUnity made its first sale of the docUnity system in June 2012.

Meanwhile, in August 2010, Maureen Mitchell, the president and owner of ATS, who had become aware of Waldron and Heath's early efforts to create a new system, wrote to the defendants and alleged that they had breached their duties to ATS, their contracts with ATS, and Georgia trade secret law. Mitchell asserted, "It is not possible that you or Miles Waldron could have written competing software that does not infringe on our rights in less than thirty days. It is more likely that your software product(s) are derived from our code, raising infringement issues and criminal theft issues."

About 13 months later, ATS filed a verified complaint asserting claims of misappropriation of trade secrets and confidential information, conversion of the OptiDoc source code, tortious interference by Heath with Waldron's contract, tortious interference with ATS's customer contracts, breach of Waldron's employment contracts, fraud, RICO, breach of fiduciary duty, theft of corporate opportunity,

6

conspiracy, and copyright infringement. ATS also sought an injunction,[4] punitive damages, and attorney fees.

Shortly thereafter, the defendants removed the case to federal court based on that court's original jurisdiction of the copyright claim. The federal district court granted the defendants' motion for summary judgment on ATS's claim that the defendants infringed on ATS's copyright for OptiDoc. In so doing, the federal court found that (1) ATS failed to present direct evidence that the defendants copied the OptiDoc source code and (2) failed to demonstrate indirect evidence of copying because it did not show that OptiDoc and docUnity were substantially similar. As a part of these findings, the federal court held that Mitchell's testimony that the products were practically identical in function and appearance was insufficient because no one from ATS had examined the docUnity source code nor used a working version of the product and ATS had not retained an expert to testify as to the similarity of the two products.

Following remand to superior court, the defendants moved for summary judgment on ATS's remaining claims. Waldron and Heath attached affidavits in

_____

[4] ATS did not, however, seek a hearing on injunctive relief, and later admitted that it now seeks only damages.

7

which they averred that they did not consider the September 2009 bridge program to be related to or competitive with ATS; they did not perform any work or planning in connection with KM Docs between September 2009 and July 2010; all work performed on docUnity and docDNA occurred after July 12, 2010; OptiDoc and docUnity/docDNA are functionally and technologically dissimilar; version 1 of docUnity/docDNA was not completed until late spring 2012; Waldron did not use ATS source code in the creation of docUnity/docDNA; and neither man stole, converted, or misappropriated ATS source code or any other ATS asset. ATS did not file any affidavits or other evidence in response to the defendants' motion. Following a hearing, the trial court granted the motion for summary judgment without explanation.

In its initial appellate brief, ATS alleges error with regard to six of its claims: (1) Waldron breached the Trade Secrets Agreement in various ways concerning the "viewer" module, the "bridge" software, and OptiDoc, as well as by failing to return the "viewer" module and OptiDoc source codes upon termination; (2) Waldron misappropriated portions of OptiDoc source code and design for use at KM Docs; (3) Waldron misappropriated ATS confidential information, including the "viewer" module source code, the "bridge" software, and the OptiDoc source code; (4)

8

Waldron misappropriated and used ATS trade secrets, including the OptiDoc source code; (5) Heath tortiously interfered with Waldron's Trade Secret Agreement by inducing Waldron to program the "bridge" software and to begin writing docUnity while still employed at ATS; and (6) Heath and Waldron conspired to breach Waldron's Trade Secret Agreement and misappropriate ATS software in all of the above ways. Accordingly, ATS's appeal of all other counts upon which summary judgment was granted are either waived or abandoned. See *Toberman v. Larose Ltd. Partnership*, 281 Ga. App. 775, 779, (1), n. 1 (637 SE2d 158) (2006).

1. We first address the defendants' argument that ATS is precluded by the doctrine of collateral estoppel from raising some or all of these arguments as a result of the federal court's decision on ATS's claim of copyright infringement. See generally *Meagher v. Quick*, 264 Ga. App. 639, 645 (2) (594 SE2d 182) (2003) ("where issues common to both federal and state actions are ruled upon in the earlier federal proceeding, . . . collateral estoppel operates to prevent re-litigation of such issues in the subsequent state action") (citation omitted).

The federal court addressing ATS's copyright claim based its decision on one element of a claim of copyright infringement: "whether the defendant, as a factual

9

matter, copied portions of the plaintiff's program."[5] On that point, ATS was required to present direct evidence of copying or inferences from indirect evidence "demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work." *MiTek*, 89 F3d at 1554 (III) (A). The federal court held that ATS wholly failed to present any direct evidence of copying because ATS had failed to examine the defendants' source code. The court further held that ATS failed to present indirect evidence of probative similarities between OptiDoc and docUnity because none of ATS's witnesses had ever seen an actual working version of docUnity, ATS had not retained an expert to testify as to the similarity of the two products, ATS's reliance

---

[5] To maintain a claim for copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications v. Rural Tel. Svc. Co.*, 499 U. S. 340, 361 (III) (111 SCt 1282, 113 LE2d 358) (1991) (citation omitted). The second prong involves two separate questions:

> 1) whether the defendant, as a factual matter, copied portions of the plaintiff's program; and 2) whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.

*MiTek Holdings v. Arce Eng. Co.*, 89 F.3d 1548, 1554 (III) (A) (11th Cir. 1996) (citation and punctuation omitted).

upon one "screen shot" of docUnity was not sufficiently probative, and one of ATS's witnesses averred that docUnity did not have much of the functionality that OptiDoc has.

The doctrine of collateral estoppel "precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies." *Karan, Inc. v. Auto-Owners Ins. Co.*, 280 Ga. 545, 546 (629 SE2d 260) (2006) (citation and punctuation omitted). The issue also must have been necessary to the prior decision. *Boozer v. Higdon*, 252 Ga. 276, 278 (1) (313 SE2d 100) (1984). If these conditions are met, the issue "may not be re-litigated, even as part of a different claim." *Karan*, 280 Ga. at 546 (citation and punctuation omitted). We therefore must address whether ATS's remaining claims are dependent on the issues actually litigated and adjudicated by the federal court that were necessary to the determination of the copyright claim.

The federal court did not address any issues with regard to the "viewer" module, the "bridge" software, failure to return ATS software to ATS upon termination, or the allegation that Waldron wrote some portion of the docUnity/docDNA software while employed by ATS. ATS's claims on these issues, therefore, are not defeated by the doctrine of collateral estoppel. Consequently, ATS's

11

claims for tortious interference and conspiracy, which include some allegations related to "viewer" module or the "bridge" software, also are not defeated by collateral estoppel.

What the federal court did decide was that ATS failed to present direct evidence that Waldron copied OptiDoc source code when programming docUnity or evidence to show probative functional or design similarities between OptiDoc and docUnity. The pleadings and the appellate briefs show that ATS's claims of breach of the Trade Secrets Agreement with regard to OptiDoc, misappropriation of the OptiDoc source code, misappropriation of confidential information with regard to OptiDoc, and misappropriation of ATS trade secrets with regard to OptiDoc all turn on whether Waldron copied OptiDoc source code directly or whether there are probative functional or design similarities between OptiDoc and docUnity. Accordingly, ATS is collaterally estopped from pursuing these claims with regard to OptiDoc in the superior court. See *Hinely v. Alliance Metals, Inc. of Atlanta*, 285 Ga. App. 230, 237 (3) (b) (645 SE2d 584) (2007) (state court allegations of constructive discharge were barred by collateral estoppel "[b]ecause the federal district court . . . expressly ruled that [plaintiff] failed to present sufficient evidence to support a claim of constructive discharge") (footnote omitted); *Stark v. Govt. Accounting Solutions*,

12

(Case No. 2:07-cv-755, decided Dec. 9, 2009) (S.D. Ohio 2009) (state court's finding that defendants did not misappropriate source code or related software collaterally estopped plaintiff from asserting copyright infringement claim).

In the remainder of this opinion, therefore, we address claims related to the "viewer" module, the "bridge" software, failure to return ATS software to ATS upon termination, and the allegation that Waldron wrote some portion of the docUnity/docDNA software while employed by ATS. The following divisions are limited to these topics.

2. ATS contends the trial court erred with regard to its claim of breach of the Trade Secrets Agreement because there is an issue of fact as to whether Waldron (1) wrote and sold the "bridge" software while he was an ATS employee; (2) wrote the "viewer" software while an ATS employee yet failed to deliver the software to ATS; (3) wrote part of docUnity/docDNA while employed by ATS; and (4) failed to return the OptiDoc software/source code when he resigned.

"The cardinal rule of contract construction is to ascertain the intention of the parties." OCGA § 13-2-3. "[W]hen the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent." *Park 'N Go of Ga. v. U. S. Fidelity & Guar. Co.*, 266 Ga. 787, 791 (471 SE2d 500)

13

(1996) (citation omitted). Ambiguities in a contract will be construed against the drafter – here, ATS. *See generally L & B Const. Co. v. Ragan Enterprises*, 267 Ga. 809, 811 (482 SE2d 279) (1997).

ATS's claims depend on the provisions of the Trade Secrets Agreement signed by Waldron (not Heath) that provide that all software developed by ATS employees, with certain limitations not relevant here, is an ATS trade secret, constitutes confidential information, is owned by ATS, may not be removed without permission, and may not be utilized to create software for a third party's use without permission and a license. The specific provisions, however, raise an ambiguity as to whether these terms apply to all software that an employee develops on his personal time whether as a hobby or as a separate business activity.

> The relevant portions of the Trade Secrets Agreement provide as follows:
>
> The undersigned hereby agrees and acknowledges that [ATS] owns all software owned by ATS, its employees, officers, directors and contractors including OptiDoc. . . .
>
> The undersigned agrees and acknowledges all software developed by ATS or under development by ATS or its employees, including but not limited to Opti[D]oc, including source code, . . . (hereinafter the "Software") and which is not generally known to the public or within industries or trades is a trade secret under Georgia law. . . .

14

The undersigned further acknowledges that ATS employees are not permitted *to remove any portion of the Software including source code, . . . from the Offices* of ATS without written permission of an officer of ATS. Nor may any employee utilize any Software to develop, write, design or otherwise create any other software package *for their own personal use* or for the use of a third party without the specific written permission and license from ATS.

(Emphasis supplied) . These sections of the agreement suggest that the only software regulated by the agreement is software made by the employee in the scope of his employment for use of ATS. For example, the third quoted paragraph prohibits removing ATS software from the ATS offices. This provision suggests that the agreement regulates only software developed at those offices. The same paragraph prohibits an employee from utilizing ATS software to create "other software package[s] for their own personal use." This clause suggests that an employee is allowed to create other software, as long as the employee does not utilize ATS software is doing so. In addition, the agreement does not expressly state that its conditions apply to all software that an employee develops on his personal time whether as a hobby or as a separate business activity. And the agreement does not prohibit moonlighting.

15

At most, we find the agreement to be ambiguous about whether software developed by an employee outside of ATS offices and outside of the scope of his employment should be considered to be owned by ATS. Indeed, Waldron testified that he developed other software at home for which ATS has made no claim against him. Construing the Trade Secrets agreement against ATS, we therefore conclude that it did not prohibit Waldron from writing and selling the "bridge" software or from beginning to write docUnity (which, as has already been established, was not copied from OptiDoc) while still employed by ATS as was alleged. See, e.g., *Dept. of Community Health v. Pruitt Corp.*, 295 Ga. App. 629, 633 (673 SE2d 36) (2009) (construing change of ownership provision in Medicaid-reimbursement agreement and policy manual included therein against the drafter to determine meaning of a certain provision); *Lewis v. Uselton*, 202 Ga. App. 875, 779-880 (3) (416 SE2d 94) (1992) (construing provision in contract most strongly against attorney who drafted it). Accordingly, the trial court did not err by granting summary judgment on these claims.

The agreement also provides that Waldron had to return all ATS software and related information upon termination and to submit his computers and other devices to ATS for inspection in this regard. ATS claims that Waldron wrote the "viewer"

16

module that provides functionality in connection with OptiDoc but that he failed to give it to ATS when he resigned. But Waldron gave direct testimony that several months before resigning from ATS, he created the module to add a function to OptiDoc, that it is a part of the OptiDoc source code, that he documented the change, and that the module is, in fact, a part of every ATS customer's copy of OptiDoc and was when he resigned from ATS. ATS has not presented any evidence to refute Waldron's testimony. The trial court therefore correctly granted summary judgment on this claim.

ATS also contends the trial court erred because there is an issue of fact as to whether Waldron returned the OptiDoc source code when he resigned as required by the Trade Secrets Agreement. ATS points to an alleged discrepancy in Waldron's deposition testimony as to when he deleted the source code from his personal computer and to the fact that Waldron asked to use the source code while he was performing contract work for ATS in the first several weeks after formally resigning. But in the two items of testimony cited by ATS, Waldron testified that he erased the source code from all personal computers (1) "upon resigning"; and (2) on or about July 8, 2010, just over five weeks after his formal resignation. ATS's argument that this discrepancy means that this Court should ignore all of Waldron's testimony that

he deleted the source code is without merit. If the exact date that Waldron deleted the source code had some relevance, there might be an issue of fact. See *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28 (1) (343 SE2d 680) (1986) (if a party relies on his or her own contradictory testimony in opposition to summary judgment, a court must "construe the contradictory testimony against him"). But ATS has not made any argument nor otherwise shown that the precise date that Waldron deleted the source code has any relevance. And ATS has not contravened Waldron's direct testimony that he deleted all OptiDoc source code from his personal computers. The trial court therefore correctly granted summary judgment on this issue.

3. ATS's remaining enumerations of error also fail. ATS's second enumeration of error regarding the claim that Waldron misappropriated portions of OptiDoc for use in his new company is controlled adversely to ATS by Division 1 above. ATS's third enumeration of error regarding the claim that Waldron misappropriated confidential information is controlled adversely to ATS by Division 1 with regard to allegations related to OptiDoc. As for allegations related to the "viewer" module and the "bridge" software, ATS has failed to present any evidence to show that Waldron used confidential information in developing or creating this software. This claim, therefore, must fail. In its fourth enumeration of error, ATS claims that Heath

18

tortiously interfered[6] with the ATS-Waldron Trade Secrets Agreement and that the trial court erred by granting summary judgment on this claim. But as shown above, ATS has failed to show any violation by Waldron of the Trade Secrets Agreement, and therefore this claim must fail. ATS's fifth enumeration of error regarding the claim that Waldron misappropriated and used ATS trade secrets at KM Docs is controlled adversely to ATS by Division 1. Finally, for all the above reasons, ATS's claim that Heath and Waldron conspired to breach Waldron's Trade Secret Agreement and misappropriate ATS software is also subject to summary judgment.

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur.*

---

[6] This Court has held that

[t]he elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Blakey v. Victory Equip. Sales*, 259 Ga. App. 34, 38 (2) (d) (576 SE2d 288) (2002) (citations omitted).

19