**September 18, 2023**

# In the Court of Appeals of Georgia

A23A0896. SMITH v. SMITH.

BROWN, Judge.

This case arises from the divorce proceedings of Lauri Smith ("the Wife") and Jonathan Smith ("the Husband") and presents us with an issue of first impression regarding the ultimate custody and disposition of an embryo[1] created in preparation for in-vitro fertilization ("IVF")[2] and now in cryogenic storage. Concluding that the embryo is marital property, and applying Georgia's equitable division of property doctrine, the trial court granted the divorce and awarded custody of the frozen embryo

---

[1] The record before us defines "embryo" as a fertilized egg.

[2] IVF is the "fertilization of an egg in a laboratory dish or test tube. Specifically, IVF involves fertilization by mixing sperm with eggs surgically removed from an ovary followed by uterine implantation of one or more of the resulting fertilized eggs." www.merriam-webster.com.

to the Wife. We granted the Husband's application for discretionary appeal to review the latter ruling and for the reasons discussed below, we reverse.

The record reflects that the parties were married in June 2019, and decided to conceive a child together. The Husband has two adult children from a previous relationship; the Wife does not have any children. According to the Wife, in early 2020, both parties were diagnosed with fertility issues and were advised to see a fertility specialist, who told them that their best chance for conceiving a child was through IVF. In 2021, the Wife began taking medication to increase her egg count, and subsequently had surgery to retrieve four eggs, which were fertilized.[3] According to the Wife, only one embryo made it through the "certain cell stages and passed the genetic testing that [they] opted for." The embryo is being cryogenically stored and since the parties' separation, the Wife has been paying the $600 yearly storage fee.

On November 18, 2020, prior to beginning the IVF process, the parties executed several documents including "Agreement for Cryopreservation of Embryos and or Oocyte," which provides, in pertinent part, as follows:

---

[3] The Husband had a vasectomy reversal.

2

*DISPOSITION OF FROZEN/THAWED EGG(S):* **I/We intend to freeze eggs and subsequently thaw them at a later date for insemination and embryo transfer to the female partner's uterus. Should I/We change my/our decision in this regard for any reason I/we understand that I/we have three options:**

**1.      Eggs may be DISCARDED.**

**2.      Eggs may be DONATED for use by another patient. [Reproductive Biology Associates, LLLP ("RBA")] will determine if the frozen eggs are viable and meet FDA criteria for donation. In the case where the egg(s) are deemed ineligible for use, the eggs may not be donated anonymously. Directed donation to a KNOWN recipient will be acceptable and is a matter of informed consent covered in a separate consent form.**

**3.      Eggs may be subject to SCIENTIFIC STUDY. Scientific investigation may include but is not limited to observation by microscopy, chemical treatment and or intentional disruption of cellular structures. Eggs WILL NOT BE INSEMINATED by any sperm source without our expressed, written consent.**

**\*\*I/WE UNDERSTAND THAT IF I/WE CHOOSE TO MAINTAIN OUR EGGS IN CRYO-STORAGE THAT I/WE ARE RESPONSIBLE FOR ANY AND ALL RECURRING CHARGES OR STORAGE FEES AS COVERED IN RBA'S FEE SCHEDULE.**

. . .

The possibility of one or both of our deaths, disappearance, incapacity, inability to agree on disposition in the future, or any other unforeseen circumstance that may result in neither of us being able to determine the fate of any stored egg(s) requires the I/We now indicate my/our wishes. I/We understand that one of three decisions explained above must be made. In the event I/we are unable to make a decision later, I/we now indicate my/our decision to have any or all of our oocytes in frozen storage disposed as follows: *Please select one option*

*X X* A. **EGG DONATION**

The parties' signatures follows this selection.[4] The agreement continues as follows:

***DISPOSITION OF EMBRYO(S):* We intend to have these embryos thawed and transferred back to the female partner's uterus. However, if we should change our decision in this regard for any reason, we understand that we have three options:**

**1. EMBRYO DONATION:** Embryo(s) will be donated to another couple.

**2. CELL CULTURE AND DEGENERATION/DISPOSAL:** Embryo(s) will be thawed and discarded.

---

[4] The two choices rejected were "cell culture and degeneration/disposal" and "scientific study."

**3. SCIENTIFIC STUDY:** the embryo(s) will be observed and studied scientifically in the laboratory at RBA by microscopic or other means. The embryos will not be maintained for more than one week of further development.

We have the principal responsibility to decide the disposition of our embryo(s). While we are alive our frozen embryo(s) will not be released from storage for the purpose of donation to another couple, disposal, or scientific study without the written consent of us both. We may determine to have our embryo(s) removed from cryopreservation at any time. If embryo(s) are cryopreserved and we determine to have them removed, then our options are as previously explained as being embryo donation, disposal, or scientific study of the embryos.

The possibility of one or both of our deaths, disappearance, incapacity, inability to agree on disposition in the future, or any other unforeseen circumstance that may result in neither of us being able to determine the fate of any stored embryo(s) requires that we now indicate our wishes. We understand that one of three decisions explained above must be made. In the event we are unable to make a decision later, we now indicate our desire to have any or all of our embryos in frozen storage disposed of as follows: *Please select one option*

*X X* A. **EMBRYO DONATION**[.] The parties' signatures follow this selection. The agreement then designates the parties' desired choice with regard to the disposition of damaged or poor-quality embryos (scientific study), and then states

5

as follows: "**In the event of divorce, separation, or marriage dissolution we understand the legal ownership of** any stored embryo(s) must be determined in a property settlement and will be released as directed by order of a court o[f] competent jurisdiction."

On January 10, 2022, the Wife filed for divorce. The parties resolved all financial and property issues, but could not reach an agreement as to the single stored embryo. The matter was set down for a hearing, during which both the Wife and the Husband testified. The Wife requested custody of the embryo for implantation in herself, explaining that she is 38 years old and that this "is [her] only shot . . . due to [her] age and [her] medical diagnosis." The Wife acknowledged that there is no guarantee she will have a child if the embryo is implanted and also admitted that there are other ways for her to become pregnant, including via donated sperm. The Husband asked that the trial court "follow the agreement" and donate the embryo.

Following that hearing, the trial court issued an order in which it recognized that in deciding an issue of first impression, Georgia courts may look to rulings from other jurisdictions for guidance, and proceeded to acknowledge the three leading approaches used when determining who should be awarded an embryo upon the dissolution of a marriage: (1) the contractual approach; (2) the balancing approach;

6

and (3) the contemporaneous mutual consent approach. After considering the law, the trial court agreed with the Wife that a balancing-blended approach should apply. Using that approach, the trial court concluded that the parties had entered into a valid, binding contract in which they agreed for the disposition of their embryo under different circumstances and that each of those provisions represented "three wholly separate and independent events." However, the parties agreed that "should they divorce, the agreement would not be controlling. Rather, upon the dissolution of their marriage, they decided that the disposition of their embryo would be determined in a property settlement by order of this [c]ourt." The trial court then proceeded to apply the "equitable division of property" doctrine and awarded the frozen embryo to the Wife, concluding that she had made significant contributions to create a viable embryo, including changing her diet, receiving numerous injections, and undergoing surgeries, "all to ensure the embryo's survival." The Husband appeals this ruling.

1. In two related enumerations, the Husband contends that the trial court erred in not enforcing the unambiguous terms of the agreement which provided for embryo donation in the event that the parties could not agree in the future and that it erred in interpreting the agreement to delegate final disposition of the frozen embryo to the trial court. We agree.

7

As noted above, this is an issue of first impression. And, as neither this Court nor the Supreme Court of Georgia has addressed the issue, we look to other jurisdictions for guidance. See *Lee v. Smith*, 307 Ga. 815, 823 (3) (838 SE2d 870) (2020). In his brief, the Husband identifies the three approaches utilized by courts to resolve custody over frozen embryos, all three of which were identified by the trial court in its order: (1) the contractual approach; (2) the balancing approach; and (3) the contemporaneous mutual consent approach.

(a) *The Contractual Approach*. Under the contractual approach, "courts will enforce contracts governing the disposition of pre-embryos[5] which were entered into at the time of in vitro fertilization so long as they do not violate public policy." (Emphasis omitted.) *Szafranski v. Dunston*, 993 NE2d 502, 506 (II) (B) (1) (Ill. App. Ct., June 18, 2013). The advantages of this approach are that it encourages the parties to enter into agreements in order to avoid possible future costly litigation and it eliminates bureaucratic and judicial "involvement in private family decisions." Id. In one of the first cases to address the issue, the Court of Appeals of New York noted:

---

[5] Pre-embryo is a fertilized human egg/ovum in the first fourteen days after fertilization, before implantation in the uterus has occurred. www.yourdictionary.com/pre-embryo.

[P]arties should be encouraged in advance, before embarking on IVF and cryopreservation, to think through possible contingencies and carefully specify their wishes in writing. Explicit agreements avoid costly litigation in business transactions. They are all the more necessary and desirable in personal matters of reproductive choice, where the intangible costs of any litigation are simply incalculable. Advance directives, subject to mutual change of mind that must be jointly expressed, both minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision. Written agreements also provide the certainty needed for effective operation of IVF programs. . . . To the extent possible, it should be the progenitors — not the State and not the courts — who by their prior directive make this deeply personal life choice.

*Kass v. Kass*, 696 NE2d 174, 180 (B) (N.Y., May 7, 1998).

(b) *The Balancing Approach*. Under the balancing approach, "courts enforce contracts between the parties, at least to a point, then balance their interests in the absence of an agreement." *Szafranski*, 993 NE2d at 512 (II) (B) (3). New Jersey has adopted the balancing approach as the first and only step in deciding suits over the disposition of pre-embryos upon divorce. See *Bilbao v. Goodwin*, 217 A3d 977, 985 (I) (Conn., Nov. 5, 2019), citing *J. B. v. M. B.*, 783 A2d 707 (N. J., Aug. 14, 2001). Most courts use the balancing approach as a second step, to be employed only after

9

it is determined that no enforceable agreement between the parties exists such that the contractual approach does not resolve the issue. See, e.g., *Jessee v. Jessee*, 866 SE2d 46, 53 (II) (Va. Ct. App., Dec. 14, 2021) ("[a]bsent such a contract, a court should employ the balancing approach"); *In re Marriage of Rooks*, 429 P3d 579, 593 (II) (D) (Col., Oct. 29, 2018); *Reber v. Reiss*, 42 A3d 1131, 1136 (Pa., Apr. 11, 2012); *Davis v. Davis*, 842 SW2d 588, 604 (VIII) (Tenn. Sup. Ct., June 1, 1992). In *Davis*, where the parties did not have an agreement concerning disposition of the pre-embryos, the Tennessee Supreme Court held that

> disputes involving the disposition of preembryos produced by in vitro fertilization should be resolved, first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed.

842 SW2d at 603 (VIII). The court noted that

> an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors. This conclusion is in keeping with the proposition that the

10

progenitors, having provided the gametic material giving rise to the preembryos, retain decision-making authority as to their disposition.

(Footnote omitted.) Id. at 597 (V). Because there was no agreement in the case, the court turned to balancing the interests of the parties:

> Resolving disputes over conflicting interests of constitutional import is a task familiar to the courts. One way of resolving these disputes is to consider the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions. In this case, the issue centers on the two aspects of procreational autonomy — the right to procreate and the right to avoid procreation. We start by considering the burdens imposed on the parties by solutions that would have the effect of disallowing the exercise of individual procreational autonomy with respect to these particular preembryos.

(Footnote omitted.) Id. at 598 (V), 603 (VII). In that case, the court ultimately concluded that the husband's interest in avoiding parenthood where "he would face a lifetime of either wondering about his parental status or knowing about his parental status but having no control over it" outweighed the wife's interest in donating the frozen embryos to another couple for implantation. Id. at 604 (VII).

One of the most recent cases to employ the balancing approach noted that most courts use it as

11

a second step, only to be employed after it is determined that no enforceable agreement between the progenitors exists and, thus, that the contractual approach does not resolve the issue. This is because the balancing approach ultimately puts the disposition of a pre-embryo in the hands of a court and not in the hands of the progenitors.

(Citation omitted.) *Bilbao*, 217 A3d at 985 (I).

(c) *The Contemporaneous Mutual Consent Approach*. "This approach proposes that no embryo should be used by either partner, donated to another patient, used in research, or destroyed without the contemporaneous mutual consent of the couple that created the embryo." (Punctuation omitted.) *Szafranski*, 993 NE2d at 510 (II) (B) (2), quoting *In re Marriage of Witten*, 672 NW2d 768, 778 (III) (C) (2) (Iowa, Dec. 17, 2003). Under this approach, a prior agreement is not treated as a binding contract:

If either partner has a change of mind about disposition decisions made in advance, that person's current objection would take precedence over the prior consent. If one of the partners rescinds an advance disposition decision and the other does not, the mutual consent principle would not be satisfied and the previously agreed-upon disposition decision could not be carried out. When the couple is unable to agree to any disposition decision, the most appropriate solution is to keep the embryos where they are — in frozen storage. Unlike the other possible disposition decisions — use by one partner, donation to another patient, donation to research, or destruction — keeping the embryos frozen is not final

12

and irrevocable. By preserving the status quo, it makes it possible for the partners to reach an agreement at a later time.

(Citation and punctuation omitted.) *Szafranski*, 993 NE2d at 510-511 (II) (B) (2). "While the approach benefits from ease of application and at least the appearance of respecting the rights of the parties' involved," it is not "immune from criticism." Id. at 511 (II) (B) (2). As one court has noted, "[t]his approach strikes us as being totally unrealistic. If the parties could reach an agreement, they would not be in court." *Reber*, 42 A3d at 1135, n.5. See also *Markiewicz v. Markiewicz*, No. 355774, 2022 WL 883683, at *6 (V) (B) (Mich. Ct. App., Mar. 24, 2022) ("[f]orcing the parties to decide later is making no decision at all") (citation and punctuation omitted).

A majority of states that have addressed the issue apply the contractual approach as the first step in deciding a disagreement over pre-embryos in the event of divorce. To date, courts in ten states have done so, including Arizona, Connecticut, Illinois, Maryland, New York, Ohio, Oregon, Tennessee, Texas, and Washington. See *Jocelyn P. v. Joshua P.*, 250 A3d 373, 404 (I) (D) (Md. Ct. Spec. App., Apr. 29, 2021); *Terrell v. Torres*, 456 P3d 13, 17-18 (Ariz., Jan. 23, 2020);[6] *Bilbao*, 217 A3d

---

[6] We note that since *Terrell* was decided, the Arizona legislature enacted A.R.S. § 25-318.03, which directs the disposition of embryos in marriage dissolution proceedings regardless of any contract and provides that it shall be awarded to the

13

at 986 (II); *Szafranski*, 993 NE2d at 506 (II) (B) (1), 514 (II) (C); *Karmasu v. Karmasu*, No. 2008 CA 00231, 2009 WL 3155062 (II, III, VI) (Ohio Ct. App., Sept. 30, 2009); *In re Marriage of Dahl and Angle*, 194 P3d 834, 840 (Or. Ct. App., Oct. 8, 2008); *Roman v. Roman*, 193 SW3d 40, 50, 55 (Tex. App., Feb. 9, 2006); *Litowitz v. Litowitz*, 48 P3d 261, 268 (Wash., June 13, 2002); *Kass*, 696 NE2d at 180 (B); *Davis*, 842 SW2d at 597 (V) (parties did not have an agreement, but court found that "an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors").

(d) *This Appeal*. In this case, as discussed above, the trial court concluded that the parties had entered into a valid, binding agreement in which they agreed for the disposition of their frozen embryo under different circumstances and that each of those provisions represented "three wholly separate and independent events." However, the parties agreed that "should they divorce, the agreement would not be controlling. Rather, upon the dissolution of their marriage, they decided that the disposition of their embryo would be determined in a property settlement by order of

spouse who intends to allow it to develop to birth.

14

this [c]ourt." The trial court then appears to have applied the blended approach (the contract approach advocated by the Husband and the balancing approach advocated by the Wife) — while simultaneously invoking Georgia's equitable division of property doctrine — and awarded the frozen embryo to the Wife, concluding that she had made significant contributions to create a viable embryo, including changing her diet, receiving numerous injections, and undergoing surgeries, "all to ensure the embryo's survival." Because there is an enforceable agreement here, we conclude that there was no reason for the trial court to have employed the blended approach and/or Georgia's equitable division of property doctrine. Rather, as held by the Tennessee Supreme Court, "if there is dispute, [the parties'] prior agreement concerning disposition should be carried out." *Davis*, 842 SW2d at 604 (VIII). Moreover, as will be explained more fully below, under general contract principles, we disagree with the trial court's interpretation of the agreement.

As the *Kass* court noted, while "[t]he subject of this dispute may be novel, . . . the common-law principles governing contract interpretation are not." 696 NE2d at 180 (B).

> Contract construction is generally a question of law for the court. We
> follow a three-step process in construing a contract, first determining if

15

the contract language is clear and unambiguous. When a contract contains no ambiguity, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. If, however, the contract is unclear, we attempt to resolve the ambiguity by applying the rules of contract construction. Where the contract remains ambiguous even after we apply the rules of construction, then the parties' intent must be determined by the factfinder. Ambiguity exists when a contract is uncertain of meaning, duplicitous, and indistinct, or when a word or phrase may be fairly understood in more than one way. Under Georgia law, words in a contract generally bear their usual and common meaning and the usual and common meaning of a word may be supplied by common dictionaries.

(Citation and punctuation omitted.) *King v. GenOn Energy Holdings*, 323 Ga. App. 451, 454-455 (2) (747 SE2d 15) (2013). See also *In re Estate of Boyd*, 340 Ga. App. 744, 747 (798 SE2d 330) (2017) ("[w]hen enforcing a post-nuptial contract, such as the Agreement here, courts are to enforce the contract as written by the parties").

The agreement in this case is virtually identical to the one at issue in *Kass*, wherein that court noted:

The conclusion that emerges most strikingly from reviewing [the parties'] consents as a whole is that appellant and respondent intended that disposition of the pre-zygotes was to be their joint decision. The consents manifest that what they above all did not want was a stranger taking that decision out of their hands. Even in unforeseen

16

circumstances, even if they were unavailable, even if they were dead, the consents jointly specified the disposition that would be made. That sentiment explicitly appears again and again throughout the lengthy documents. Words of shared understanding — "we," "us" and "our" — permeate the pages.

696 NE2d at 181 (B).[7] Likewise, in this case the parties expressly agreed that "[*w*]*e*

_____

[7] The consent document in *Kass* provided, in pertinent part, as follows:

III. *Disposition of Pre–Zygotes*. We understand that our frozen pre-zygotes will be stored for a maximum of 5 years. We have the principal responsibility to decide the disposition of our frozen pre-zygotes. Our frozen pre-zygotes will not be released from storage for any purpose without the written consent of *both* of us, consistent with the policies of the IVF Program and applicable law. In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction. Should we for any reason no longer wish to attempt to initiate a pregnancy, we understand that we may determine the disposition of our frozen pre-zygotes remaining in storage.

The possibility of our death or any other unforeseen circumstances that may result in neither of us being able to determine the disposition of any stored frozen pre-zygotes requires that we now indicate our wishes. THESE IMPORTANT DECISIONS MUST BE DISCUSSED WITH OUR IVF PHYSICIAN AND OUR WISHES MUST BE STATED (BEFORE EGG RETRIEVAL) ON THE ATTACHED ADDENDUM NO. 2–1, STATEMENT OF DISPOSITION. THIS STATEMENT OF DISPOSITION MAY BE CHANGED ONLYY [sic] BY OUR SIGNING ANOTHER STATEMENT OF DISPOSITION WHICH IS FILED WITH THE IVF PROGRAM[.]

have the principal responsibility to decide the disposition of *our embryo(s)*" and that

while the parties are alive, the parties' frozen embryo(s) would not be released "from

storage for the purpose of donation to another couple, disposal, or scientific study

---

(Emphasis in original.) 696 NE2d at 176. An additional portion of the consent form titled, "INFORMED CONSENT FORM NO. 2—ADDENDUM NO. 2–1: CRYOPRESERVATION—STATEMENT OF DISPOSITION," provided:

> We understand that it is IVF Program Policy to obtain our informed consent to the number of pre-zygotes which are to be cryopreserved and to the disposition of excess cryopreserved pre-zygotes. *We are to indicate our choices by signing our initials where noted below.*
>
> 1. We consent to cryopreservation of all pre-zygotes which are not transferred during this IVF cycle for possible use by us in a future IVF cycle.
>
> 2. In the event that we no longer wish to initiate a pregnancy or are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes, we now indicate our desire for the disposition of our pre-zygotes and direct the IVF program to (choose one):
>
> (b) Our frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program[.]

(Punctuation omitted; emphasis in original.) Id. at 176-177.

19

without the written consent of *us both*." (Emphasis supplied.) The agreement here also included an additional provision in bold where the parties acknowledged as follows: "**We intend to have these embryos thawed and transferred back to the female partner's uterus. However, if we should change our decision in this regard for any reason, we understand that we have three options[.]**" In this regard, the parties agreed that their embryo should be donated in the event of "one or both of our deaths, disappearance, incapacity, *inability to agree on disposition in the future*, or any other unforeseen circumstance that may result in neither one of us being able to determine the fate of any stored embryo(s)[.]" (Emphasis supplied.)

The Court of Appeals of New York affirmed the lower appellate court in *Kass*. 696 NE2d at 182 (B). In its own decision, the lower court too was particularly persuaded by the numerous points throughout the consent document where the parties, as a married couple, acknowledged their joint responsibility to dispose of any stored embryos in the event that they were unable to make such a decision in the future. See *Kass v. Kass*, 235 AD2d 150, 158 (VI) (N.Y. App. Div., Sept. 8, 1997). As set out above, here, the parties jointly stated their intention to donate the embryo(s). And, as the lower court in *Kass* aptly concluded, "[s]ince the parties now in fact no longer agree with regard to this matter, they are no longer able to render the

20

single, joint decision regarding the disposition of the pre-zygotes which the informed consent document contemplated. Accordingly, their prior statement as to disposition, as set forth . . . [in] the informed consent document, should be given effect according to its clear and unambiguous terms[.]" Id. "In interpreting a contract, the court is required by law to give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an interpretation which leaves a part of such manifestations unreasonable or of no effect." (Citations and punctuation omitted.) *Stern's Gallery of Gifts v. Corp. Prop. Investors*, 176 Ga. App. 586, 594 (4) (337 SE2d 29) (1985). Given that the parties intended to donate the embryos at the time they signed the agreement, this Court is required to honor that intention.

As for the trial court's conclusion that the provisions at issue represented "three wholly separate and independent events" and that the "divorce provision" required the trial court to decide the matter, we disagree. As a reminder, that provision provided: "**In the event of divorce, separation, or marriage dissolution we understand the legal ownership of** any stored embryo(s) must be determined in a property settlement and will be released as directed by order of a court o[f] competent jurisdiction." The agreement in *Kass* contained almost identical language, and as that

21

court concluded — and contrary to the trial court's finding in this case — the provision (unlike the other provisions) is not a dispositional provision. *Kass*, 696 NE2d at 182 (B). Indeed, unlike the other provisions, it does not contain the word "disposition."

> [T]he isolated sentence was not dispositional at all but rather was clearly designed to insulate the hospital and the IVF program from liability in the event of a legal dispute over the pre-zygotes arising in the context of a divorce. To construe the sentence as appellant suggests — surrendering all control over the pre-zygotes to the courts — is directly at odds with the intent of the parties plainly manifested throughout the consents that disposition be only by joint agreement.

(Citation and punctuation omitted.) Id.

Importantly, this provision does not alter the prior provision in which the parties agreed that in event they were unable "to agree *on disposition* in the future," the embryo would be donated. (Emphasis supplied.) As the lower court in *Kass* recognized, "[t]his provision relative to divorce did not confer on the [trial] court the right to ignore the unambiguous agreement of the parties as to the disposition of the [embryo] and to de novo create its own disposition based on what it believed was a more equitable determination." 235 AD2d at 160 (VII).

22

Moreover, given that the parties executed an enforceable agreement, there was no reason for the trial court to resort to the blended approach and/or Georgia's equitable division of property doctrine. See *Jessee*, 866 SE2d at 53 (II) ("[a]bsent such a contract, a court should employ the balancing approach"). The agreement controlled in this case, and as we have found above, the parties intended to have the IVF clinic (RBA) donate the frozen embryo in the event that they were unable to jointly agree on its disposition in the future. As the Husband points out in his brief, "Georgians need to know that contracts, whether they govern big business [or] intimate relationships, will be enforced."[8] See, e.g., *Scherer v. Scherer*, 249 Ga. 635,

_____

[8] In this vein, we note that OCGA § 19-8-41 expressly provides for the relinquishment of rights to an embryo via a written contract:

A legal embryo custodian may relinquish all rights and responsibilities for an embryo to a recipient intended parent prior to embryo transfer. A written contract shall be entered into between each legal embryo custodian and each recipient intended parent prior to embryo transfer for the legal transfer of rights to an embryo and to any child that may result from the embryo transfer. The contract shall be signed by each legal embryo custodian for such embryo and by each recipient intended parent in the presence of a notary public and a witness. Initials or other designations may be used if the parties desire anonymity. The contract may include a written waiver by the legal embryo custodian of notice and service in any legal adoption or other parentage proceeding which

23

640 (2) (292 SE2d 662) (1982) (holding that antenuptial agreements in contemplation of divorce are not absolutely void as against public policy). Indeed, as our Supreme Court recognized in *Scherer*, "[p]ublic policy is not violated by permitting these persons prior to marriage to anticipate the possibility of divorce and to establish their rights by contract in such an event as long as the contract is entered with full knowledge and without fraud, duress or coercion." (Citation and punctuation omitted.) Id. Similarly, and as other courts have acknowledged, we too understand the difficulties parties face in determining in advance their preferences for embryo disposition in the event of contingencies such as death, divorce, or illness. In this case, the Husband testified that the parties reviewed the IVF documents "heavily" and went through them "line by line" before signing them. As the Court of Appeals of New York explained, "[a]dvance agreements as to disposition would have little purpose if they were enforceable only in the event the parties continued to agree. To the extent possible, it should be the progenitors — not the State and not the courts —

---

may follow.

OCGA § 19-8-41 (a).

24

who by their prior directive make this deeply personal life choice." *Kass*, 696 NE2d at 180 (B). See also *In re Marriage of Dahl and Angle*, 194 P3d at 840-841.[9]

2. Given our holding in Division 1, we need not address the Husband's remaining enumerations of error, arguing that the trial court erred in applying the traditional analysis for equitable division of property in a divorce when awarding the frozen embryo to the Wife and that the trial court's purported analysis under the balancing approach was inconsistent with the test as articulated by the jurisdictions espousing its use.

*Judgment reversed. Markle, J., concurs. Barnes, P. J., dissents.*

---

[9] While we recognize that "a limited or specific provision will prevail over one that is more broadly inclusive," the agreement here was a contract between *the progenitors and the clinic*. It was signed by the Husband, the Wife, and a representative of the clinic. It was not a separate agreement binding during a divorce proceeding, but was intended to protect the clinic in the event of the parties' divorce, separation, or marriage dissolution. Accordingly, as we explain, the divorce provision does not contain the disposition language precisely because it was intended to protect the clinic and ensure that an order of a court preceded any release/action in relation to the embryo. The clinic did not require such a provision in relation to frozen eggs because an egg, which has not yet been fertilized, belongs to the female partner.

25

A23A0896. SMITH v. SMITH

BARNES, Presiding Judge, dissenting.

The subject agreement specifically excluded divorce from the disposition of stored egg(s) and embryo(s) clauses, and the trial court did not err in utilizing Georgia's marital property doctrine to determine ownership of the couple's embryo. For these reasons, I must respectfully dissent.

As the majority notes, this is an issue of first impression in Georgia, and thus, as is the case with such contemporary disputes, is significant to the establishment and application of law in similar future disputes.

With that being said, I agree with the majority that this case is, in essence, a contract dispute – what do the contractual provisions instruct with respect to the possession and disposition of an embryo in case of a divorce. Ancillary to this inquiry is whether the clauses regarding the disposition of the embryo also apply after a divorce. I also agree that the clauses related to the disposition of the eggs and embryo are unambiguous with respect to the fate of the eggs or embryo upon certain

circumstances. However, I do not agree with the majority that the disposition clauses apply in circumstances of a divorce, given that the couple specifically designated separate divorce provisions.

OCGA § 13-2-3 directs that, "[t]he cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." In that vein, "[w]hen the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent." (Citations and punctuation omitted.) *Advanced Technology Svcs. v. KM Docs*, 330 Ga. App. 188, 194 (2) (767 SE2d 821) (2014). Likewise, "[w]hen a provision specifically addresses the issue in question, it prevails over any conflicting general language." *Woody's Steaks v. Pastoria*, 261 Ga. App. 815, 818 (1) (584 SE2d 41) (2003).

Here, the documents signed by the couple prior to starting IVF distinguished between the disposition of eggs and embryos. The documents provided choices for the "DISPOSITION OF FROZEN/THAWED EGG(S)," to apply upon "one or both of our deaths, disappearance, incapacity, inability to agree on disposition in the future, or any other unforeseen circumstance that may result in neither of us being

2

able to determine the fate of any stored egg(s)." In such instance, the couple agreed that any egg(s) would be donated or, if they were of "poor quality," the egg(s) would be provided for scientific study. The couple then included the separate clause, directing that "[i]n the event of divorce, separation, or marriage dissolution I/We understand *the legal ownership* of any stored egg(s) reverts to the female partner." (Emphasis supplied.)

Likewise, the agreement contained separate provisions addressing stored fertilized eggs, i.e., the embryos. In that section, entitled the "DISPOSITION OF EMBRYO(S)," the provisions also reflected the couple's choices for disposition of the embryo(s) upon "one or both of our deaths, disappearance, incapacity, inability to agree on disposition in the future, or any other unforeseen circumstance." The couple agreed that any embryos would be donated or, if they were deficient in some manner, they would be provided for scientific study. As in the contractual provisions referencing the disposition of eggs, a separate divorce provision directed that "[i]n the event of divorce, separation, or marriage dissolution we understand the legal ownership of any stored embryo(s) must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction."

3

In its order, the trial court found that the couple had entered into a "valid, binding contract that, among other things, clearly and unambiguously provides for the disposition of the [couple's] embryos." But the court further found that, within that same agreement, the couple had also indicated that, in the event of a divorce, the provisions regarding the disposition of the embryo would not control; instead, as indicated by the unambiguous language of the agreement, "the legal ownership of any stored embryo(s) must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction."

In contrast to the trial court, the majority concluded, as did the court in *Kass,* that in interpreting the divorce provision, the language was not a dispositional provision because it did not contain the word "disposition." See *Kass v. Kass*, 696 NE2d 174, 182 (B) (NY 1998).[1] I believe that such an interpretation improperly

_____

[1] "While we are at liberty to consider foreign authority, the appellate courts of this state are not bound by decisions of other states or federal courts except the United States Supreme Court." (Citation and punctuation omitted.) *Balmer v. Elan Corp*., 278 Ga. 227, 229-230 (2) (599 SE2d 158) (2004). Although certainly instructive, I do not find the decision in *Kass* persuasive under the circumstances of this case. In *Kass*, the court noted that within weeks of signing similar disposition clauses and with divorce imminent, the couple had signed another document directing that "[t]he disposition of the frozen 5 pre-zygotes . . . is that they should be disposed of in the manner outlined in our consent form and that neither [wife], [husband] or anyone else will lay claim to custody of these pre-zygotes." (Punctuation omitted.) *Kass*, 696 NE2d at 177, 181-182 (B). Although "that instrument never became operative," the

4

conflates two clearly distinct provisions of the agreement – one related to the disposition of stored eggs and embryos in non-divorce circumstances, and another directing the fate of the eggs and embryos in the event of a divorce. We need look no further than the terms of the agreement to reach this conclusion.

The disposition clauses for eggs and embryos direct that they apply upon "one or both of our deaths, disappearance, incapacity, inability to agree on disposition in the future, or any other unforeseen circumstance." A divorce was obviously foreseen, as the agreement then stipulates what happens to the stored eggs and embryos in such instance – the legal ownership of eggs reverts back to the wife, and the legal ownership of stored embryos would be determined in a property settlement and released as directed by order of the court. Thus, the couple not only intentionally excepted divorce from the disposition provisions, but also carved out specific instructions for how the eggs and embryos should be handled in the event of a divorce. Moreover, rather than a circumstance in which they did not "agree on disposition in the future," the couple expressly agreed to what would happen to any stored eggs and embryos in the event of a divorce. A construction of the agreement

court expressed that the document "reaffirmed the earlier understanding that neither party would alone lay claim to possession of the pre-zygotes." Id at 181-182 (B).

5

that would render "any part of the [agreement] unreasonable or having no effect" should be avoided. *Sofran Peachtree City v. Peachtree City Holdings*, 250 Ga. App. 46, 50 (550 SE2d 429) (2001). Thus, the explicit terms specifying what would happen in the event of a divorce must prevail over any general, less specific language. See *Swisshelm v. Dept. of Human Resources*, 253 Ga. App. 816, 817 (560 SE2d 722) (2002) (noting that "under general rules of contract construction, a limited or specific provision will prevail over one that is more broadly inclusive") (citation and punctuation omitted). If the couple intended to include divorce as a circumstance covered within the dispositional provisions, they would have done so. Likewise, had they intended the dispositional provisions to be enforced after a determination of legal ownership post-divorce, they would have included that provision in the divorce clause. The couple clearly indicated that, in the event of a divorce, "legal ownership" of any stored eggs would revert back to the wife, and the couple agreed and stipulated that "legal ownership" of any stored embryo(s) would be "*determined*" by a court in a property settlement and "*released as directed*" by the court, not released as directed

6

in the disposition provisions. We need not read any more into these terms than what

is there.[2] Indeed,

> where the language at issue is plain and unambiguous, we presume that
> the parties meant what they said and we simply enforce the contract as
> written. [And] where the language of a contract is plain and
> unambiguous no construction is required or permissible and the terms
> of the contract must be given an interpretation of ordinary significance.
> Put another way, under Georgia law, this Court is not at liberty to ignore
> the specific terms of the parties' written agreement and rewrite or revise
> a contract under the guise of construing it. [I]t is the function of the
> court to construe the contract as written and not to make a new contract
> for the parties[.]

(Citations and punctuation omitted.) *Bearoff v. Craton*, 350 Ga. App. 826, 834 (1)

(830 SE2d 362) (2019).

I also do not agree with the majority's conclusion that the trial court improperly

applied the balancing approach advocated by the wife to determine custody of the

---

[2] As this Court has held, "'property settlement' and 'property division' are terms used to refer to the *determination* of who owns property when its title is disputed and to the partitioning of jointly owned property." (Citations and punctuation omitted; emphasis supplied.) *Daniel v. Daniel*, 277 Ga. 871, 873 (596 SE2d 608) (2004). Likewise, "determine," as it is ordinarily used, means "to fix conclusively or authoritatively," and "to settle or decide by choice of alternatives or possibilities," or to "resolve." See "determine," Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/determine. (Visited August 15, 2023).

embryo. In its order, the trial court discussed the analytical frameworks which other states have used to determine custody of stored embryos – including a "blended" approach in which the court first determines if there is a valid agreement (contractual approach), and then, only if no agreement exists, employs a "balancing approach" under which it "balances the interests of the parties to determine the disposition of the embryos." The court, however, then found that because the agreement had, in fact, "clearly and unambiguously" provided for the embryo's disposition, there was no reason to resort to the balancing approach, and applied "Georgia marital property law to determine the appropriate distribution of the frozen embryo."

The court did not employ the blended approach, nor did it utilize the balancing approach advocated by the wife, in determining the custody of the embryo. Instead, after finding that the plain, unambiguous language of the agreement controlled, the court applied Georgia's equitable division of property doctrine and considered "all relevant factors, including each party's contribution to the acquisition and maintenance of the property as well as the purpose and intent of the parties regarding ownership of the property."[3] It was within that framework that the court considered

---

[3] "Equitable division of property . . . is an allocation of assets acquired during the marriage to the parties, based on their respective equitable interests in those assets. Only marital property is subject to equitable division. Marital property is that

8

the parties' contribution to the embryo, and after considering certain factors, such as the wife's payment of the storage fees, fertility injections, surgery, and dietary changes, found that the wife had the stronger claim.

For these reasons, I would affirm the trial court's judgment, and thus dissent from the majority opinion.

---

which is acquired as a direct result of the labor and investments of the parties during the marriage." (Citations and punctuation omitted.) *Hipps v. Hipps*, 278 Ga. 49, 49 (1) (597 SE2d 359) (2004).